### IN THE

## SUPREME COURT OF JUDICATURE

### OF THE

## STATE OF NEW-YORK,

#### IN AUGUST TERM, IN THE FORTIETH YEAR OF OUR INDEPENDENCE.

---

## SMITH against SHAW.

IN ERROR, from the Court of Common Pleas of *Jefferson* county.

*Shaw* brought an action of assault and battery, and false imprisonment, against *Smith*, in the court below. The defendant pleaded not guilty, with notice of special justification, to be given in evidence on the trial. At the trial, in *July*, 1814, it was proved, on the part of the plaintiff, that, in *January*, 1814, *Shaw* was arrested, at *Adams*, distant about fifteen miles from *Sacket's Harbour*, by two persons, whose names were *Hopkins* and *Findley*, and carried by them to *Sacket's Harbour*. The witness applied to the defendant to get *Shaw* released, and the defendant said he had a man in the *provost guard*, by the name of *Shaw*, who had been brought there by *Hopkins;* that he had been confined four or five days, on charges of treason, and of being a spy; and that he, the defendant, should not release *Shaw*, until he had seen Lieutenant *Hopkins*, who was expected

*Where a person not subject to the jurisdiction of a court martial, is arrested, and detained for trial, for an offence not within their jurisdiction, not only the persons making the arrest are trespassers, but also a commanding officer who ratifies and affirms their acts, or himself undertakes to exercise restraint over the plaintiff, is subject to an action. Whether a mere refusal to*

discharge the plaintiff would render the commanding officer a trespasser? *Quære.* But it seems that a provost marshal would not be liable for detaining the plaintiff.

A citizen of the *United States*, not in military service, is not amenable to a court martial.

Where the subject matter of a suit is not within the jurisdiction of a court, all the proceedings are absolutely void, and the officer, as well as the party, is a trespasser.

But where the subject matter is within their jurisdiction, and the want of jurisdiction is to the person or place, the officer is excused, unless the want of jurisdiction appears on the process.

to return to *Sacket's Harbour* in eight or ten days; that he, the defendant, was not acquainted with the civil law, but knew the martial law, and should be governed by it; that he should regret to keep an innocent man in confinement, and, if he were satisfied of the innocence of *Shaw*, he would release him. *Shaw* was brought before the defendant, by his order, and stated that a person of the name of *Burr*, at *Sacket's Harbour*, knew him to be a citizen of the *U. States.* *Smith* made some excuse for not then sending for *Burr*, but said he would send for him the next day, and remanded *Shaw* to the guard house. The witness understood from *Smith*, that he was the commanding officer at *Sacket's Harbour.* The witness, about ten days after, saw *Shaw* at large, in *Adams.*

Another witness stated, that when *Smith* was applied to, as above stated, in behalf of *Shaw*, he appeared to have forgotten him, and observed, that he had been very much occupied; that he regretted to detain an innocent man; but that he must investigate the case, before he could, with propriety, discharge him. It was proved that *Shaw*, (a native of *Scotland*,) was a naturalized citizen of the *United States*, and resided in the county of *St. Lawrence* at the time of his arrest.

The defendant below, offered to prove, in justification, that on the 6th of *January*, 1814, the plaintiff below was committed by *Hopkins* and *Findley*, then officers in the army of the *United States*, to the officer commanding the provost guard at *Sacket's Harbour*, and, by their order, was taken and kept by that officer, in his custody; that *Hopkins* and *Findley*, at the time of the commitment of the plaintiff, delivered to the officer of the guard, a writing signed by them, stating the charges against the plaintiff to be, " exciting insurrection and mutiny among the good citizens of the *United States*, at the town of *Adams*, in the state of *New-York*, on the 6th of *January*, 1814 ;" " violating his parole as a prisoner of the enemy, and engaging in an illicit trade, to furnish the enemy with necessaries from the *United States*:" ' " Being an enemy's spy in time of war, between *Great Britain* and the *United States*;" under which last charge, it was specified, " making improper and suspicious inquiries of, and concerning the military post at *Sacket's Harbour*, in the vicinity of the same ; and for lurking in and about said post, without any apparent cause, or business;" The defend-

ant further offered to prove, that the plaintiff was so committed, and so received, and detained by the officer of the provost guard; that it was the same detention complained of; and that the defendant could not legally prevent the said arrest and detention of the plaintiff.

The court below refused to admit the evidence thus offered by the defendant, in *justification*; but decided, that it might be received in *mitigation of damages*; and with that direction the cause was left to the jury, who found a verdict for the plaintiff for 779 dollars and 25 cents. The counsel for the defendant tendered a bill of exceptions to the opinion of the court below, on which the writ of error was brought to this court.

*Sterling*, for the plaintiff in error, contended, that the evidence offered by the defendant, in justification, was improperly rejected by the court. The defendant below was not answerable for the arrest of the plaintiff. It was made without the knowledge or consent of the defendant, who knew nothing of the plaintiff, until he was committed to the custody of the officer of the provost guard. Was the defendant bound to discharge without any inquiry into the circumstances of the case? It does not follow, because a person has a command, or control over the arresting officer, that he is responsible to the person arrested, without *legal* notice of his being unlawfully detained. Legal notice to the defendant, must be the decision of a court martial, as to the innocency of the prisoner. According to the laws and usages of war, the defendant could not have discharged *Shaw* without investigating the causes of his commitment.

By the articles of war, (80, 81, 82.,) an officer commanding a guard, or provost marshal, is bound to receive and keep any prisoner committed to his charge by an officer of the army, provided such officer delivers an account in writing, signed by him, of the crime with which the prisoner is charged; and such prisoner cannot be released " without proper authority."

The " proper authority," mentioned in the articles of war, is not the will and pleasure of the commanding officer, but the decision of a regular court martial. It may be said, perhaps, that the defendant did not proceed according to the articles of war, but discharged the plaintiff, afterwards, on being convinced of his innocence, without any court-martial having been held.

If the defendant did so, he acted without proper authority, and at his peril.

But we contend, that the detention of the plaintiff was not unlawful. The plaintiff was charged with being a *spy*, and with a breach of his *parole ;* these were offences within the jurisdiction of a court martial. It is enough to justify the officer, that the *subject matter* is within the jurisdiction of the court. If the court has no jurisdiction as to the *person* of the party arrested, he must come in and plead it.* We do not pretend that citizens are subject to courts martial for crimes; but if the *subject matter* is within the jurisdiction of a court martial, the party must plead, that he is a *citizen,* and not a soldier. In *Grant* v. *Gould,*† it was admitted, that a court martial had a right to try and decide the question, whether *soldier* or not. Such a power is inseparable from its jurisdiction. It must, however, take care to decide the question on proper and sufficient evidence.

But we contend, that the plaintiff, as to his *person,* was subject to a court martial; he was an *alien,* born in the enemy's country, and, *prima facie,* was an alien enemy.

Again, admitting that the plaintiff was a naturalized citizen, he might, on the principles of natural and unalienable allegiance, be treated as a spy. He might be treated according to the laws of his native country. The doctrine of perpetual allegiance has been recognised by our courts. In the case of *Isaac Williams,* who was tried in the circuit court of the *United States,* for the district of *Connecticut,* in *September,* 1799, Chief Justice *Ellsworth,* adopted the principle and the reasoning of *Blackstone,* relative to allegiance, or the political compact, and considered it as still the common law of this country. He accordingly rejected the evidence offered by the prisoner, to show that he was a naturalized citizen of *France.*

A court martial had power to try the question, whether *Shaw* was a *naturalized citizen* or not. Citizenship is a plea that might be urged by every person arrested as a spy, and it must necessarily be tried by the court martial before whom he is brought. It may be said the articles of war of the *United States* speak only of officers and soldiers: so do the *mutiny acts* in *England ;* yet courts martial try the question, whether a person is a soldier or not.

* *Lucking* v. *Denning,* 1 *Salk. Rep.* 201. *Cowper,* 476. 1 *Caines' Rep.* 92.

† 2 *Hen. Bl. Rep.* 69. 86.

Again, as to the policy of this doctrine: it is essential to the public safety. *Salus populi, suprema lex est.* This is not a doctrine dangerous to liberty, or to the rights of citizens, qualified as it is with the requisites, that there must be a case of necessity, a *probable cause*, for the arrest. *Silent leges inter arma.* In cases which are for the public good, a man may justify doing a wrong; as, in time of war, a person may erect bulwarks on the land of another.* A man may justify pulling down a house that is burning, to save the neighbouring houses. Cases of necessity and public exigency are exceptions to the general rules of common law. If the rights of public property may be violated, in time of war, for the public good, why may not the rights of person be violated also? It is admitted on all hands, that if the plaintiff had been a *spy*, his detention would have been justifiable and proper. Now, the defendant did nothing more than every officer, in his situation, was bound to do; that is, to make inquiry into the truth of the facts charged against the prisoner, whom it was necessary to detain, until the fact of his being a spy, or not, could be ascertained. It is impossible for the commanding officer to know whether the person arrested is a spy or not, without investigation.

*\* Noy's Maxims, 23. Plowd. 322. Dyer, 36. b.*

But the plaintiff being an *alien, born in Scotland,* was, *prima facie,* an enemy; and there was, therefore, a probable cause for the detention.

Again, had not the defendant a right to detain the plaintiff, in order to deliver him over to the civil power, there being a charge of treason against him? The 82d article of war requires every officer or provost marshal, to whose charge prisoners are committed, within twenty-four hours after such commitment, or as soon as relieved from his guard, to report, in writing, to the commanding officer, the names of the prisoners, their crimes, and the names of the persons who committed them.

*Storrs,* contra, (*Van Vechten,* same side.) The plaintiff, being a naturalized citizen of the *United States,* is, by our law, entitled to all the rights and privileges of a native citizen, without exception. Even in *England,* an alien naturalized by act of parliament, though incapable of holding certain offices, is in the same state as if he had been born in the king's ligeance,† and is entitled to the same privileges and immunities. The doctrine of

*† 1 Bl. Com. 374.*

perpetual allegiance has no application to this case. The question is not between the government of the *United States* and that of *Great Britain,* but between this government and one of its naturalized citizens. The policy of our government has been to protect its naturalized citizens, not only in this country, but every where; and, if they did not receive the same protection as a native citizen, the act of naturalization would be a cruel mockery.

Then, what are the rights and privileges of a native citizen? He is entitled, in every possible case, to protection from military power. The laws, rules, and articles of war apply exclusively to officers and soldiers, or such persons as are subject to military law. These military courts martial are of very special and limited jurisdiction. Martial law, as it is called, is, as Sir *Matthew Hale*‡ observes, in truth, no law, but something merely indulged as law.(a) The civil or municipal law knows no such thing as a *military state* or military court. Our citizens, in this respect, are in the same state as if no war existed. Independent of the mutiny act in *England,* or of our act of congress relative to the army, no such thing as a court martial or military law is known. Without this special act, a court martial would not have power even to try a *spy.* Being a spy is an offence against the law of nations, and might be tried by a court of common law. The second section of the act establishing rules and articles of war, passed *April* 10, 1806, defines a spy. It declares, "that, in time of war, all persons not citizens of, or owing allegiance to, the *United States of America,* who shall be found lurking as spies, in or about the fortifications or encampments of the armies of the *United States,* or any of them, shall suffer death, according to the law and usage of nations, by sentence of a general court martial." It cannot, surely, be pretended that the plaintiff, a naturalized citizen, could be treated as a spy. The plaintiff is entitled to all the benefits of our constitution and bill of rights. It is one of the very grievances enumerated in the declaration of independence, that the king had affected to

*Hist. C. L.
c. 2. p. 54. (5
ed.)

(a) Lord *Loughborough,* in *Grant* v. *Gould,* (2 H. Black. 98.) said, that *martial law,* as described by *Hale* and *Blackstone,* did not exist in *England* at all. It had been exploded for more than a century, as contrary to the constitution. The *mutiny act,* passed from time to time, is the authority for courts martial, which are subject to the controlling power of the courts of *Westminster Hall,* to prevent any excess of jurisdiction by those special courts.

render the military independent of, and superior to, the civil power. It is matter of astonishment, that in less than forty years, and in the life of the men who framed that instrument, it should be urged in a court of justice, that this military power can be exercised in this country: in *England* it would not even be debated.

The bill of exceptions does not state even that the defendant offered to prove, that the plaintiff was lurking in or about the fortifications or camp at *Sacket's Harbour.* If the defendant meant to justify, he ought to have pleaded specially, or given notice of the precise facts he intended to prove. The notice states no more than what the defendant offered to prove, namely, that *Hopkins* and *Findley*, officers of the army of the *United States*, committed the plaintiff to the officer of the guard, or provost marshal; and that the defendant, therefore, had a right to detain him, until he inquired into his case, or had the plaintiff tried by a court martial.

If the two officers who arrested the plaintiff were trespassers, then the defendant was a trespasser: he must be deemed, by relation, a party to the original arrest; in judgment of law, he was present, and a party to the arrest—every officer and soldier was under his absolute command and control. The plaintiff, moreover, was brought into the presence of the defendant, and claimed his rights as a citizen, but the defendant ordered him back to the guard house. A moment's delay, after such a claim, for any cause, was unjustifiable. A military commander, after a claim of citizenship, cannot detain the party, or, if he does so, it is at his peril. The defendant said he knew nothing of the civil law, but should be governed by the martial law.

Because courts martial have jurisdiction over spies, it does not follow that they have a right to detain and try every person charged as a spy. To make out a justification, the defendant should show that he had jurisdiction over the *person* of the plaintiff. If a military commander is allowed to be a judge, and to decide the question whether a person is a citizen or not, he has jurisdiction throughout, and may order a court martial, and have the party tried and executed. If such be the law, on what ground did this court issue a *habeas corpus*, in the case of *Stacy*, to a military commander, and order an attachment against him, in case he did not discharge the prisoner forthwith? If the

commander, in that instance, had authority to try, this court could not discharge on *habeas corpus*.

But it is said the defendant might detain the plaintiff, in order to hand him over to the civil magistrate. This is a new ground of justification. The defendant did not pretend to be a civil or peace officer. It is the first time we have heard of military commanders being peace officers. An officer of the peace is bound to inquire, and may justify an arrest, and detention, on *probable cause*. A mere citizen arresting another for a felony, does it at his peril. But what grounds, or probable cause have been shown by the defendant? The plaintiff was arrested fifteen miles from *Sacket's Harbour*, and his place of residence was more than one hundred miles from that place.

Again, the facts in justification were before the jury.

*N. Williams*, in reply, said, the question was, whether the defendant was acting as a ministerial officer, in a case in which it was his duty to act. If he was, and he exercised his best judgment, he cannot, by any principle of law, or doctrine of *relation*, be made a trespasser.* The defendant merely received a prisoner who had been arrested by officers who had a right to arrest.

The detention of the plaintiff, before he was reported to the defendant, cannot be imputed to the defendant. And, the defendant had a right, afterwards, to detain the plaintiff a reasonable time, to inquire into the case, and ascertain the truth of his claim to be discharged.† And what is a reasonable time, must depend on the circumstances of the case. Now the Court below decided that the defendant had no right to detain the plaintiff at all, not that he detained him an unreasonable time.

Admitting that the defendant had no right to decide the question, whether the plaintiff was a citizen or not; we say, that for that very reason, he had a right to detain him, until the question could be decided by a court martial, or the proper authority.

THOMPSON, Ch. J., delivered the opinion of the Court. This case comes before the court upon a writ of error to the

* 11 *Johns.*
*Rep.* 121. 158.
160.

† *Taylor* v.
*Brander,* 1
*Esp. N. P.*
*Cases,* 45.

common pleas of *Jefferson* county, upon a bill of exceptions taken at the trial, for excluding the testimony offered on the part of the defendant below. The action was for false imprisonment; and the defendant, under the general issue, gave notice of a justification; to support which, upon the trial, he offered to prove, that the plaintiff was committed to the *provost* guard by *Hopkins* and *Findley*, who were officers of the army of the *United States*, charging him, the plaintiff, in writing, with having excited mutiny among the citizens of the *United States*, violating his parole, as a prisoner, and engaging in an illicit trade, and furnishing the enemy with necessaries from the *United States*, and being an enemy's spy in time of war between *Great Britain* and the *United States*. It appeared in evidence, on the part of the plaintiff below, that he was a naturalized citizen of the *United States*, and was arrested by *Findley* and *Hopkins*, at a place called *Adams*, about fifteen miles distant from *Sacket's Harbour*, where the army was stationed. Under these circumstances, the question presented to the court below was, whether the evidence offered on the part of the defendant, would amount to a justification. It was overruled as a justification, but admitted, or offered to be received, in mitigation of damages.

There can be no doubt but that the rights and the responsibility of the defendant must be governed by the rules of law, applicable to courts of special and limited jurisdiction. And it is a general rule, that where such a court has neither jurisdiction of the subject matter, nor of the person, every thing done is absolutely void, and all are trespassers who are concerned in the proceedings. None of the offences charged against *Shaw* were cognizable by a court-martial, except that which related to his being a spy; and if he was an *American* citizen, he could not be charged with such an offence. He might be amenable to the civil authority for treason; but could not be punished under martial law, as a spy. There was, therefore, a want of jurisdiction, either of the person or of the subject matter, as to all the offences alleged against the plaintiff. There can be no doubt but that *Hopkins* and *Findley* were trespassers, and the defendant's liability must depend upon the fact how far he has ratified and affirmed their acts, or has himself undertaken to exercise any restraint over the plaintiff. Had he barely refused to discharge him until tried by a court martial, I should

question whether he could be made a trespasser by such refusal. But he went further, and, in some measure, affirmed the arrest; for, on application being made to him in behalf of the plaintiff, he said *he* had such a man in the provost guard, and that he should not release him, until he saw *Hopkins;* that he knew the martial law, and must be governed by it; thus claiming the right to hold and try him by a court martial. Nor did the defendant stop here: he undertook to act affirmatively, and ordered the plaintiff to be brought before him, and after making some examination and inquiries, remanded him to the custody of the *provost* marshal. This was a direct and positive exercise of authority and restraint.

The damages recovered against the defendant appear to me to be very high; but this is a question which cannot be taken into consideration by this court. The judgment must be affirmed, unless the evidence offered by the defendant could have afforded a complete justification. The conduct of the defendant in this case, does not appear to have been harsh and oppressive. But it is the principle involved in it, which renders the question important. If the defendant was justifiable in doing what he did, every citizen of the *United States* would, in time of war, be equally exposed to a like exercise of military power and authority. It was not pretended on the argument, that if the plaintiff was a citizen he was amenable to a court martial for any of the offences alleged against him. And the defendant could certainly have no legal right to detain him to try that question before a court martial. In this respect, he acted at his peril. Suppose a *habeas corpus* had been issued from this court to bring up the plaintiff, would it have been a sufficient return by the defendant, that he detained him for the purpose of trying by a court martial whether he was a citizen or not. The defendant does not stand in the situation of a subordinate officer, bound to obey the command of his superiors. He was the commanding officer at *Sacket's Harbour*, and had a right, without doubt, to discharge the plaintiff. At all events, *Hopkins* and *Findley* had no authority to compel him to detain him. Had the suit been against the provost marshal, more difficulty would have been presented. For, under the rules and articles of war, he was bound to receive him; and he would have exposed himself to punishment had he voluntarily released him. (1 *Sess.* 9 *Cong. ch.* 20. *Ar.* 80, 81.) The

situation of the provost marshal might be considered some- ALBANY.<br>August, 1815.
what analogous to that of the pound-keeper in *Badkin* v. *Pow-*
*ell,* (*Comp.* 476.) where it was held, that he was not a tres- SMITH<br>v.<br>SHAW.
passer merely for receiving a distress, though the original tak-
ing was tortious, because he was bound to take and keep what-
ever was brought to him. But the defendant cannot be pro-
tected under this principle. He had, as I have before shown,
made himself the *party* detaining the plaintiff. The general
rule which appears to be laid down in the books is, that where
the subject matter of any suit is not within the jurisdiction of
the court applied to for redress, every thing done is absolutely
void, and the officer, as well as the party, becomes a trespasser.
But when the subject matter is within the jurisdiction of the
court, and the want of jurisdiction is to the person or place,
then the officer is excused, unless the want of jurisdiction ap-
pears on the process. (10 *Coke,* 76. *Hard.* 480.) But in the
case of *Wise* v. *Withers,* (3 *Cranch,* 331.) the liability, even
of the officer, was extended by the supreme court of the *United*
*States* beyond what this rule would seem to warrant. It was
there held, that trespass lies against a collector of militia fines,
who distrained for a fine imposed by a court martial upon a
person not liable to be enrolled ; the court martial having no
jurisdiction in such cases. The court said, it is a settled princi-
ple that the decision of such a tribunal, in a case clearly with-
out its jurisdiction, cannot protect the officer who acts under
it; that the court and officers are all trespassers. It is un-
necessary, in the present case, to press the principle so far, as
the defendant cannot, in any manner, be considered as standing
in the light of a ministerial officer. That a want of jurisdic-
tion of the person renders the proceedings void, and makes the
party procuring them a trespasser, is well settled. As in the
case of *Perkin* v. *Proctor,* (2 *Wils.* 382.) where it was held,
that trespass lies against the assignees under a commission of
bankruptcy, sued out against a person not liable to be declared
a bankrupt. And in the case of *Mostyn* v. *Fabrigas,* (*Comp.* 175.)
Lord *Mansfield,* in giving the opinion of the court, refers to a
suit brought by a carpenter in the train of artillery, against
Governor *Sabine,* who had barely confirmed the sentence of a
court martial, by which the plaintiff had been tried and sen-
tenced to be whipped, and the governor was held responsible,
in an action of trespass, *because the plaintiff was not liable to*

*martial law.* Although there is no reason to believe, but that the defendant acted in good faith, and under an honest impression, that he was discharging his duty, yet we think he acted without authority, and that the matter offered in evidence would not have afforded a justification. The judgment of the court below must therefore be affirmed.

SPENCER, J., (*dissenting.*) After the fullest consideration, I am unable to arrive at the same result to which my brethren have come, and must, therefore, dissent from their opinion. I shall content myself with merely stating the grounds of my dissent.

It cannot be pretended that the plaintiff in error is at all responsible for the arrest of *Shaw* by *Hopkins* and *Findley*, and his first imprisonment in the provost guard. The 80th article of the act for the establishing rules and articles for the government of the armies of the *United States*, provides, that no officer commanding a guard, or provost marshal, shall refuse to receive, or keep, any prisoner committed to his charge, by an officer belonging to the forces of the *United States*, provided the officer committing shall, at the same time, deliver an account, in writing, signed by himself, of the crime with which the prisoner is charged. The 81st article forbids an officer commanding a guard, or provost marshal, releasing any person committed to his charge, without proper authority for so doing. The 65th article authorizes any general officer, commanding an army, or colonel, commanding a separate department, to appoint general courts martial.

*Hopkins* and *Findley*, it was offered to be shown, were, at the time of *Shaw's* commitment, officers in the army of the *United States*; that they committed him to the officer of the guard, or provost marshal, and at the same time delivered to him an account in writing, signed by them, of the crimes with which they charged *Shaw*, among which was the following: his "being an enemy's spy, in time of war between *Great Britain* and the *United States*," with a specification of his "making improper and suspicious inquiries of and concerning the military post at *Sacket's Harbour*, in the vicinity of the same, and for lurking in and about the said post without any apparent cause or business."

The bill of exceptions furnishes no evidence, direct, pre-

sumptive, or probable, that the plaintiff in error was, in the least, privy to the defendant's arrest by *Hopkins* and *Findley*, or his reception by the officer of the guard, or provost marshal. The 80th article virtually confers on any officer belonging to the forces of the *United States*, the power of committing, as prisoners, such as have committed offences cognizable by military law. Whether they are responsible for arresting persons not amenable to a military tribunal, is not the present question. It is enough to exempt the plaintiff in error from any liability for the acts of inferior officers, that they have the power to commit offenders for trial, and, especially, when the superior officer has not, in any manner, participated in the act of commitment. The article in question, by requiring the provost marshal to receive any prisoner, committed as the defendant in error was, presupposes the right of any officer to commit; and every officer possesses this right independently of his superior.

To maintain that the plaintiff in error is responsible for such an act, without any privity of his, is, in effect, to maintain that a commanding officer is responsible for every act of an inferior officer or soldier under his command; a doctrine too absurd to require refutation.

It appears from the bill of exceptions that the defendant was a naturalized citizen of the *United States*, born in *Scotland*, and then residing in the county of *St. Lawrence*, and as such, by the 2d section of the Act of Congress of the 10th of *April*, 1806, was not liable to be tried as a spy; and it has been contended, that as there was a want of jurisdiction over the person of the defendant, all who were concerned in arresting and detaining him were guilty of false imprisonment.

I am free to admit, that *Hopkins* and *Findley* were trespassers. Their act was self moved and voluntary, and at their peril; but I am not prepared to admit that the *provost marshal*, or the plaintiff, were trespassers. As to the provost marshal, we perceive that the 80th and 81st articles of war require him, under certain conditions, which, in this instance, were complied with, to receive prisoners committed to his charge; and he is forbidden to release them without proper authority for so doing. The case of *Budkin* v. *Powell and others*, (*Comp.* 476.) is expressly in point. There, an action of trespass was brought against two persons, for taking the plaintiff's horse and cart, as well as against the pound-keeper, for receiving them: the original taking

was admitted to be wrongful; and the court held, that, as the pound-keeper was bound to take and keep whatever was brought to him, at the peril of the person who brings it, he was not a trespasser; and Lord *Mansfield* said, "it would be terrible were he liable to an action for refusing to take cattle in, and were he also liable in another action for not letting them go." As to the plaintiff in error, it is urged, that if he be not answerable for the original imprisonment, he made himself so by remanding *Shaw* to the custody of the provost marshal.

It appears, by the bill of exceptions, that *Shaw* was brought before the plaintiff in error, who was the commanding officer at *Sacket's Harbour*, when the defendant stated, that a Mr. *Burr* knew him to be a citizen of the *United States*; the plaintiff in error made some excuse for not sending for *Burr* at that time, but said he would on the morrow, and then remanded the defendant in error to the guard; and, in about ten days thereafter, the witness, who testified to the above facts, saw the defendant at *Adams*.

It is manifest, from the bill of exceptions, that the defendant in error was brought before the plaintiff in error, at his own request, and with a view of procuring his enlargement without a trial by a court martial; the act, then, of going before the plaintiff, was for the defendant's benefit. Had the plaintiff in error been merely passive, and refused to interfere, it seems to me impossible to consider him as a *tort feasor*. It does not appear that the plaintiff in error had the power to appoint a general court martial. A spy can be tried only by a general court martial, and such courts can be appointed only by a general officer commanding an army, or a colonel commanding a separate department. (Art. 65.) There is no proof that the plaintiff in error was a general officer commanding an army, or a colonel commanding a separate department. Before the plaintiff in error can be implicated for not making the appointment, the defendant in error was bound to show he was the one or the other. If, however, the plaintiff in error had the power, and neglected to exercise it, the case of *Salmon* v. *Percival*, (*Cro. Car.* 196.) is decisive, that case, and not trespass, would be the proper and only remedy. It comes, then, to this : had the plaintiff in error a legitimate right to discharge the defendant, who had been regularly committed for one of the highest offences, without being subjected to a court martial; and was he bound, upon the mere

allegation of the prisoner himself that he was a citizen, to exercise that power?

I doubt very much, whether the power to discharge a person thus committed, without a trial, resides in any officer; it cannot, and ought not, to be inferred from the fact that the plaintiff in error professed his willingness to discharge the defendant, if innocent, nor from the fact that he subsequently discharged him without a trial. It is one thing for an inferior military officer to obey his superior, and it is another, and quite a distinct consideration, whether he was bound to obey. In analogy to proceedings in the civil tribunals, it is very certain, that a person committed by magistrates, charged with an offence, cannot be discharged from custody, and from the offence, without the intervention of a court, and an investigation into the offence before, at least, a grand jury. I cannot but consider the defendant's discharge as an act of power, exercised gratuitously and mercifully; not an act which could have been required.

I have already observed that the plaintiff in error, in ordering the defendant to be brought before him, evidently did so at the defendant's request, and for his benefit; and it appears that the result was, to accelerate the defendant's discharge from imprisonment: the remanding the defendant, under the circumstances of the case, amounted to no more than a declining to discharge him on his own allegation. This was not a new or distinct commitment. Had the plaintiff in error gone to the provost marshal, and heard the defendant's allegations, and declined interfering affirmatively, there could be no pretence to charge the plaintiff as a trespasser. The remanding was, in effect, no more than a refusal, on the part of the plaintiff in error, to interfere at that time. It appears to me most unreasonable, that the defendant in error, at whose request, and for whose benefit, the act of bringing him before the plaintiff was done, shall make that act, and a declining to interfere, upon the mere naked assertion of the defendant, an independent and substantive act of imprisonment.

What is an officer, circumstanced as the plaintiff in error was, to do? He finds a man, of whom he knows nothing, charged with an offence, in writing, and under the hands of two of his officers, with a crime of the most heinous nature, a crime endangering a post of immense importance, a crime punished, as well by our laws as those of every nation, with death: the person thus im-

plicated calls on him to be discharged from imprisonment, upon the allegation that he is a citizen; the imprisonment is continued, until the commanding officer becomes satisfied that the allegation of citizenship is true, and then the prisoner is enlarged. I see no fault, no violation of law, nothing unreasonable, in this procedure. To hold, that a commanding officer is bound to know the fact of citizenship of every person committed by others as a spy, and that he must instantly release him, without an opportunity to make inquiry, and become satisfied of the fact, is most unreasonable, and I do not believe it to be law.

I have met with no case bearing out the court below in considering the plaintiff a trespasser. I am sensible it has been decided by the Supreme Court of the *United States*, (3 *Cranch*, 337.) that it is a principle, that the decision of a court martial, in a case clearly without its jurisdiction, cannot protect the officer who executes it. This I do not think applies to this case, even if the position was indisputable. To give a court complete jurisdiction, there must be jurisdiction as well over the person as the offence, or, as applied to civil proceedings, over the cause of action. In *Truscott* v. *Carpenter* and *Man*, (1 Lord *Raym.* 229.) the court held, that neither the officer nor party are bound to take notice whether the cause of action arose out of the jurisdiction of the court; and they condemned the resolution in the case of the *Marshalsea*, as a hard one, and warranted by none of the books; and say, if the cause of action arose out of the jurisdiction of the court, the defendant ought to plead it; and, if he does not, the affair of jurisdiction is over, and he shall not take advantage of it in any collateral action against the plaintiff, or the officer who executes the process. The same doctrine will be found in *Lutw.* 937. 1560. and 1 *Freem.* 322.

It appears to me, that the case of *Olict* v. *Bessey*, (2 Sir *T. Jones*, 214.) has a strong bearing on this case. There the plaintiff had been arrested by process, without the jurisdiction of the court; he was carried within the liberty, and delivered to the defendant, who was a gaoler of the liberty; and the question was, whether false imprisonment lay. The court, after many arguments, held, that the action did not lie against the gaoler, for he had done no wrong to the party, but that only which belonged to his office, which did not oblige him to inquire whether the first arrest was tortious or not; even if he had been informed of the tortious taking, he ought to have detained the

prisoner, being delivered to him with a good warrant for the arrest. The plaintiff here, is not strictly in the same situation as the provost marshal, not personally having the custody of the defendant. He had, however, a supervisory power over him; and what would justify the provost marshal for detaining the defendant, would justify him. I again repeat it, the plaintiff in error did not make the arrest, and he was under no obligation to discharge the defendant in error, without a trial by a court martial. The commitment by *Hopkins* and *Findley*, was a warrant both to the plaintiff in error and the keeper of the provost guard, for his detention. It would, in my judgment, be most irrational and mischievous, that an officer, in the situation of the plaintiff in error, should be bound first to try, and, at his peril, exercise his judgment on the truth of the charge. The principle contended for pushes the absurdity further: the plaintiff in error is not even allowed to inquire whether the defendant in error was exempted from a trial as a spy, or not, in consequence of his alleged citizenship. I cannot yield my assent to doctrines so unjust and unreasonable; and am, therefore, of opinion, that the judgment below ought to be reversed, because the court did not allow the evidence offered to be a full justification.

PLATT, J., not having heard the argument of the cause, gave no opinion.

Judgment affirmed.