3g 523
188  120

# Kneedler *versus* Lane et al.   Smith *versus* Lane et al.   Nichols *versus* Lehman et al.

1. The decision of the court heretofore made in these cases, declaring the act of Congress of March 3, 1863, commonly called the conscription law, unconstitutional, is now overruled, the act declared constitutional, and the injunctions then granted dissolved.

2. The power to grant an injunction to restrain the commission of a merely personal tort doubted.

3. The rule, that when an application to dissolve a preliminary injunction is made before answer, it must be supported by affidavit on the part of the defendant in answer to those upon which the injunction was obtained, is but a rule of practice for the relief of the court, and not for the protection of complainants, and is applicable only to cases where the facts averred in the bill and special affidavit of the complainants are disputed.

4. An interlocutory injunction is not demandable, of right, but may be denied, or granted and dissolved at the discretion of the court.

Per STRONG, READ, and AGNEW, J. J., C. J. WOODWARD and THOMPSON, J., dissenting.

At NISI PRIUS.   In Equity.

Motion to dissolve the preliminary injunction ordered in this case, as previously reported.

On the 12th December, 1863, Mr. Knox, for the defendants in each case, applied to Mr. Justice STRONG, then holding the Nisi Prius, to dissolve the injunctions theretofore granted in said court.   Judge STRONG received the motions, and appointed the 30th December instant for their hearing, and, as in the former proceeding, requested his brethren to sit with him. The motions to dissolve the injunctions were argued before all the judges on the 30th and 31st days of December.

*J. C. Knox*, for the motion to dissolve the injunctions.

*George W. Biddle, Peter McCall*, and *Charles Ingersoll*, contra.

The opinion of the court was delivered January 16th, 1864, by

STRONG, J.—When the motions for preliminary injunctions were made in these cases, and all the judges of the Supreme

[*Kneedler v. Lane et al.   Smith v. Lane et al.   Nichols v. Lehman et al.*]

Court were invited to hear the argument, and advise what orders should be made, I was of opinion that there was no equity in the complainants' bills, and I advised that the injunctions asked for should be denied. I thought then, as I think now, that the act of Congress of March 3d, 1863, under which the defendants were acting, is constitutional, and therefore that they had neither done nor proposed to do anything contrary to law or injurious to the complainants. The reasons upon which my opinion was founded I then reduced to writing, and they are on file in this court. They are not all which I might have given. Upon the power of a State court to enjoin a Federal officer against the performance of a duty imposed upon him by an act of Congress, I refrained from expressing any opinion. I refrain now. Yet I had no doubt then, and I have none now, that these bills do not present a proper case for the interference of a court of equity, by injunction, even if the act of Congress were unconstitutional. The facts charged exhibit no case for the action of a court of equity. No chancellor ever enjoined in such a case, and I think it has never before been supposed that he has any jurisdiction over such a wrong (if it be a wrong) as these complainants ask to be restrained. During the whole of the two arguments to which I have listened, one in support of the original motions, and the other against the present motions to dissolve the injunctions, I have heard no reference to an authority for the position that a court of equity has any right to interfere in such a case. I believe no authority of the kind can be found. Reference has, indeed, been made to our act of assembly of June 16, 1836, which confers upon this court and the several courts of Common Pleas power to "prevent or restrain the commission or continuance of acts contrary to law, and prejudicial to the interests of the community or the rights of individuals;" but until now it has never been supposed that this act extends the preventive power of this court beyond that possessed by any English chancellor. No one has ventured to assert that every civil wrong may be restrained by injunction, and that a judge sitting in equity can enjoin against any act that a common law court and jury can redress. It was jurisdiction and power in equity that the legislature intended to bestow upon our courts; and it has never been seriously claimed that they bestowed more than is possessed and exercised by courts of equity in England and in other States. But when, before these cases, was an injunction ever granted to restrain the commission of a merely personal tort? What chancellor ever asserted he had such power? It was hinted in the argument that the power must be vested in this court, because the privilege of the writ of *habeas corpus* has been suspended in certain cases. The hint

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

will not bear examination. How can the suspension of the writ of *habeas corpus*, either by Congress or any branch of the Federal government, enlarge the jurisdiction of this court? Or how can the restoration of this privilege curtail its jurisdiction? The extent of the powers of every court in this State is defined by State law. It is not in the power of Congress to enlarge it, either by direct or indirect action. Besides, if the suspension of the privilege of the writ of *habeas corpus* could confer upon a State court a power to enjoin against an arrest (a power which, without the suspension, it would not possess), then the Constitution of the United States, in authorizing it in cases of rebellion or invasion, when the public safety may require it, has merely converted a *habeas corpus* into an injunction, and substituted a bill of equity for a common law writ. Then the object sought to be accomplished by the constitutional provision has utterly failed. Manifestly, the Constitution contemplates the possible necessity of arrests without the interference of courts in times of rebellion or invasion, and it has provided for such cases by authorizing a denial of the privilege of the writ of *habeas corpus*. But what does this amount to, if the very act of taking away the writ enlarges the power of State courts of equity, and justifies them in interfering to prohibit the arrests. I will not, however, pursue this subject further; I mention it at all only because I would not have it thought that I admit the power of this court to interfere by injunction, even if the defendants proposed wrongfully to force the complainants into the military service of the United States.

When the injunctions were ordered in these cases I endeavored to show that the act of Congress of March 3d, 1863, is constitutional; that consequently the bills exhibit no wrong done, or threatened to be done, to the complainants, and that for this reason they have no equity. I have heard nothing since which has raised even a doubt of the correctness of the opinion I then gave. Very much might be added to what I said in vindication of the constitutional power of Congress to enact the law, and in refutation of the objections urged against it; but I should hardly be justified in entering again upon a discussion of that subject before these cases came up for final decrees.

It was strenuously insisted at the argument that the present motions should not be entertained, because the defendants have neither demurred to the bill, nor put in an answer, nor presented affidavits denying the facts averred, and because the cases stand now as they did when the orders for the injunctions were made. It is said that a preliminary injunction will not be dissolved until an answer has been put in, or at least until affidavits on the part of the defendants have been filed.

[Kneedler *v.* Lane et al.  Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

In answer to this it may be said that whatever may be the extent of the rule thus invoked in opposition to these motions, it is still but a rule of practice existing for the relief of the court, and not for the protection of complainants.  An interlocutory injunction is entirely at the discretion of the court.  It is not a thing of right.  Complainants cannot demand it.  It is always granted or dissolved according to the will of the chancellor, and if at any stage of the cause he sees fit to dissolve it, no right of the complainants is taken away.  I admit the general rule to be that when an application to dissolve an injunction is made before answer, it must be supported by affidavits on the part of the defendant in answer to those upon which the injunction was obtained.  Decisions to this effect may be found in any number.  But the rule is applicable only to cases where the *facts* averred in the bill and special affidavits of the complainants are disputed.  It has no relation to cases where the defect is in the complainant's equity, not in the evidence of his facts.  More frequently a motion to dissolve an injunction is based upon a denial of the facts charged in the bill, but a defendant may move to dissolve it on the sole ground of want of equity in the bill.  *Minturn* v. *Seymour*, 4 Johns. Cha. 173 ; *Canal Co.* v. *Railroad Co.*, 4 Gill & Johnson, 7. When the motion is made for such a reason it need not be supported by affidavits, and a bill requiring such support would be absurd.

The facts all appear in the bill of the complainant.  They are not controverted.  Nothing is in issue but the equity arising out of conceded facts, and affidavits either asserting or denying that would be a novelty indeed.  Neither courts of law or courts of equity, in any case, require the law or the equity to be made to appear by affidavits.  The decisions cited in support of the rule of practice referred to have no relation to such cases as the present, which are motions to dissolve injunctions for want of equity in the bill.  They could not have been cited unless the distinction between the facts which raise an equity and the equity itself had been overlooked.

Thus, in the case first above cited, Chancellor Kent allowed a motion to be made to dissolve an injunction granted by himself for the want of equity in the bill, though the defendant had not answered.  Nor does it appear that he had submitted any affidavits.  And in the *Canal Co.* v. *Railroad Co.*, above cited, it was said by Chancellor Bland, in reference to a motion to dissolve an injunction, that " if it should appear the facts as stated in the bill, looking to the bill alone, gave rise to no equity, it is very certain that the injunction would be dissolved whether the defendants had answered or not, or however imperfectly they might have answered."  The contest in these

cases relates solely to the question whether the complainants have any equity on their own showing.   Clearly they have not, if the act of Congress is constitutional.   Now, it is not denied that, if the defendants, before these motions were made, had put in answers admitting all the facts charged in the bills, as they might have done, it would be the duty of the court to dissolve the injunctions, if the facts raise no equity in favor of the complainants, and that such a course would be perfectly regular.   In what particular would the conscience of the court be better informed had such answers been put in, than it is now?   At most, then, the objection urged with so much vehemence to entertaining the present motions, the objections that the cases stand now as they did when the injunctions were granted, is but the minutest technicality, and interposed not in furtherance of justice, but to defeat it.   In truth, however, it does not rise even to the dignity of a technicality, for the present motions are founded, not upon a denial of anything that could be verified by affidavit, but upon a want of equity in the bills, and to such motions the rule requiring answers controverting the facts alleged by the complainants is totally inapplicable.

And were it not so, if the rule is for the protection of the court, and not of the complainants, as no one doubts, and if the dissolution of the preliminary injunctions, equally with the grant of them, lies wholly in the sound discretion of the court, as all the books agree, there are abundant reasons in these cases why the motions to dissolve should be entertained, and why the orders heretofore made should be set aside.

The orders were made at Nisi Prius, and they are, in fact, but the orders of a single judge, though he undoubtedly took the opinions of all his brethren.   Still, the orders were his, and his alone.   They could be nothing more.   Our act of assembly of July 26, 1842 (P. L. 433, sec. 9), turns all cases in equity, brought in the Supreme Court, over to the judge at Nisi Prius, and they come into the Supreme Court *in banc* only after final decree.   And it was at Nisi Prius that these motions were made.   The judge before whom they were made has called in the other judges, not to decide but to advise what disposition shall be made of them.   This he has done from respect to them and because they advised when the injunctions were ordered. It is not easy to see that any other course would have been decorous.   The motions are, therefore, pending.   Nothing can be gained or secured by a continuance of the injunctions.   The bills on their face show that the complainants must have gone into the military service of the United States, and beyond any possible interference of the defendants, or that they had commuted, or had been exempted, before the injunctions were

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

ordered, and even before the motions for injunctions had been argued.

The orders of the judge at Nisi Prius can, therefore, have no possible beneficial effect upon the condition of the complainants, while if they remain, made as they were in accordance with the advice of a majority of the judges of the Supreme Court, and upon the ground that the act of Congress is unconstitutional, they hold out to every drafted man a temptation to resist all attempts to coerce him into military service.   Unnecessarily to continue such a temptation is cruelty, if a majority of the Supreme Court now believe the act of Congress to be constitutional, and that, consequently, forcible resistence to it would be a crime.

Again, the orders for the injunctions were made ex parte, after argument on behalf of the complainants alone.   No one attended for the defendants.   It is true there was an appearance on record for the defendants in one of the cases, and notice of the motion was served on the solicitor, who appeared in that case.   But there was no appearance in the other two cases, and there was no proof of notice of the motions to all the defendants.   They are not the same in the several cases.   If there was laches in responding to the notice of the motion in one case, there is no proof of any laches in the other two.   And, in fact, the injunctions were ordered against official action of government officers.   To the government laches is not to be imputed.

Nor ought it to be overlooked that the orders for the injunctions were in their character extraordinary and unprecedented. When before was an act of Congress ever declared unconstitutional by a State court in deciding upon a motion for an interlocutory order ?   A just respect for the government under which we live demands that if there was a mistake in such a case, the court should seize with avidity the earliest opportunity to rectify it instead of persisting in the error under cover of a rule adopted only to secure its own convenience.   I may add that in other cases there has been no hesitation in listening to applications for the correction of mistakes into which even the Supreme Court *in banc* has been supposed to have fallen. This very week a motion was entertained in the Supreme Court to change a final judgment given at Pittsburg in October term last.   It was supported by no affidavit, nor had there been any change of the record, or any new pleadings.   Yet not a judge hesitated to entertain the motion, or to hear an argument in its support and another against it.   If such motions are allowed in reference to final judgments, how can it consistently be said that a motion to dissolve injunctions ordered on interlocutory motion, based on the reason that the bill exhibits

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

no equity, may not be entertained, unless accompanied by affidavits denying, not the facts, but the equity?

Once more.  The records show that the injunctions ordered in these cases have never been issued.  They would have been fruitless if they had been.  The complainants have filed no bonds, nor have they taken out any injunctions.  They have rested satisfied with the orders.  The matter, therefore, remains perfectly within the jurisdiction of the court, even if the dissolution of an injunction itself was not discretionary.  These are quite sufficient reasons, in my judgment, for entertaining the present motions, even if the rule of practice, on which the complainants rely, applies to such cases as these.  And manifestly it does not.  There is nothing in the way of deciding these motions on their merits.  And as I am satisfied that the bills of complainants have no equity, and that the act of Congress is such as Congress has the constitutional power to enact, I think the orders for preliminary injunctions made in all these cases should be rescinded, and that the motions for the injunctions should be overruled.

Such being the opinion of a majority of the judges of the Supreme Court, the orders are directed to be vacated, and the motions for injunctions are overruled.

Concurring opinion filed January 16, 1864, by

READ, J.—Upon the present motions heard before us at Nisi Prius, several questions were discussed at length by the counsel for the complainants.  Upon the one, which was essential in any aspect to entitle them to ask for the interference of this court, the alleged unconstitutionality of the act of Congress of the 3d March, 1863, I have not changed my views, as already expressed in my opinion delivered at Pittsburg, on the 9th November last.  Upon a calm and dispassionate reconsideration of the question, I am firmly of opinion that this act is a perfectly constitutional exercise of the power vested in Congress by the Constitution, and binding upon us as judges of the Supreme judicial tribunal of the State, and upon all the people of the United States.  Upon this point I shall say nothing more.

Another question urged upon us, by one of the counsel, was our power to prohibit and restrain by injunction officers of the United States, acting under the authority and in strict conformity to an act of Congress, from performing their official duties, and thus practically nullifying it within the State of Pennsylvania.  For such a position no authority was or could be cited.  No State court before the filing of these bills had ever been asked to exercise such a power against the General

[*Kneedler v. Lane et al.   Smith v. Lane et al.   Nichols v. Lehman et al.*]

government, unless a precedent is to be found in the conduct of South Carolina in the days of President Jackson.

It was, however, argued that as a power to discharge these individuals from the custody of the officers of the United States by the writ of habeas corpus issued by this court, existed before the suspension of that writ by the President, under the act of Congress, therefore, this proceeding might be resorted to in order to attain the same end, and thus defeat the intention of the Legislature of the United States. If this can be done by a State court, then the suspension of the habeas corpus by Congress, when in cases of rebellion or invasion the public safety requires it, is evaded and practically nullified. Such cannot be the law of the land.

The habeas corpus operates upon a person in custody; the present injunctions go a step further—they prohibit the individuals from being taken into custody, and if they are legally operative, then the officers of the United States never can have them in their custody. Now the courts of the United States have no authority to grant the writ of habeas corpus for the purpose of inquiring into the cause of the imprisonment, where the prisoner is in the custody of State officers acting solely under State laws, unless under special provisions intended to provide for the effectual execution of acts of Congress, or for the protection of citizens or subjects of a foreign state under certain circumstances. I think the converse of the proposition is true without any exception, that no State tribunal can issue a writ of habeas corpus, and under it discharge a person in the custody of an United States officer acting in strict conformity to an act of Congress, and holding him by virtue of the authority thus vested in him. In such a case the writ can only be issued by the courts and judges of the United States, who are the only tribunals to decide upon the legality and validity of the imprisonment. This arises from the nature of the State and General governments, so well described by Chief Justice Taney in *Ableman* v. *Booth*, which really rules the present question. The origin and extent of this decision will be better understood by referring to the opinions of two of the judges of the Supreme Court of the United States who sat in that case, delivered some years before it was decided. Justice Nelson, in his charge to the Grand Jury in 1851, 1 Blatchford's C. C. Rep. 635 to 640, on the subject of the fugitive slave law, uses this language:—

" Another subject," says the learned judge, " arising out of the provisions of this law, and which has a material bearing upon its execution, it is proper should be noticed. By the second section of the third article of the Constitution, it is declared that ' the judicial power shall extend to all cases in

law and equity arising under this Constitution, the laws of the United States and treaties made or which shall be made under their authority.' The power, therefore, it will be seen, to execute this act of Congress, belongs to the tribunals and authorities of the General government; and in respect to these, can be executed only by such courts or officers as are specially designated in the act for that purpose. The power, therefore, is exclusive in these courts or officers, both as it respects the tribunals of the State and others of the Federal government. Neither can act or interfere in the execution of the law, and in case of any attempt by either to interfere or exercise the authority, its acts would be *coram non judice* and void. These propositions are elementary, and so obvious as• to require no further comment.

"It seems to be supposed, however, in some quarters, that the State power exercised by its tribunals, under the writ of habeas corpus, forms an exception to this generally admitted doctrine; and that through the agency of this writ, the fugitive may be taken out of the hands of the federal officers, and the authority or propriety of the arrest or detainer be inquired into, and the person be discharged or remanded according to the judgment of the State magistrate. This is the exception claimed, to the exclusive power of the federal officers designated in the act.

"It is apparent, if this exception can be maintained, that there is an end of the complete execution of the law; or, *indeed, of any law of the General government, by which the party is subject to an arrest.* It is not claimed that the State magistrate can under this writ administer the act and enforce its provisions, as that authority, as we have seen, is confined to the tribunals appointed by the act for the purpose. The fugitive must therefore be taken, if taken at all, out of the hands of the federal officers by force of some other law. And the question whether he or she shall be discharged or remanded, will depend upon the application of that law to the particular case. What that law is, or may be, must necessarily depend upon State regulation; and the rights of the claimant under the Constitution and laws of the Union will thus be determined by a law of the State.

"The effectual abrogation of the act, by the interposition of this writ, if admitted, will be still more apparent, when we reflect that the power exercised under it is such as the State legislature may choose to prescribe; and that the State tribunals are not only invested with that power, but if they act at all, are bound to act in obedience to and in conformity with it. There is no limit, therefore, to the extent of the powers that may be exercised under this proceeding, in respect to the

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

arrest and detainer of the fugitive, but the discretion of the State legislatures. They may confer jurisdiction upon their magistrates to re-examine and revise the acts and decisions of the federal tribunals, out of whose hands the fugitive is taken, and the State magistrate would be bound to execute the power accordingly. It is manifest that it would be impossible to uphold the due execution of the law, with the admission of any such authority.

"Conceding, however, the soundness of this general view, and the inability of the State tribunals to interfere with the Federal authorities, when they are acting upon cases arising under the Constitution, laws of Congress, or treaties, still it is argued that they possess the power under this writ to inquire into the legality of the authority under which the prisoner is held, and *which may involve the constitutionality of the law*, and the jurisdiction of the court or officer. But it is obvious, that the existence of either on the part of the State tribunals would be fatal to the authority of the Constitution, laws, and treaties of the General government. No government could maintain the administration or the execution of its laws, civil or criminal, if their constitutionality or the jurisdiction of their judicial tribunals were subject to the determination of another."

Having proceeded to say he considers this question settled, he says: "There have been different opinions entertained by the judges of the States, as to their power under this writ to decide upon the validity of a commitment or detainer by the authority of the United States. But those who have been inclined to entertain this jurisdiction admit that it cannot be upheld where it appears from the return that the proceeding belonged exclusively to the cognizance of the General government.

"These views of the paramount authority of the laws of the Federal Government in no way endanger the liberty of the citizen. The writ of habeas corpus secured to him under that government affords the appropriate and effectual remedy for any illegality in the process or want of jurisdiction in the courts, or for any unconstitutionality of the law."

The distinction between the States and the General government upon this point was clearly pointed out by Judge Sumner in the Massachusetts Convention, called to determine whether the Constitution of the United States should be ratified or not. "Congress," said he, "have only power to suspend the privilege to persons committed by their authority. A person committed under the authority of the States will still have a right to the writ." 2 Elliot's Debates, 108.

Doctrine of a similar character had been previously laid

down by the late Mr. Justice McLean in *Norris* v. *Newton*, 5 McLean, 92, at the May Term, 1850, of the Circuit Court of the United States, for the State of Indiana; and the germ is to be found in the opinion of Judge Story in *Prigg* v. *The Commonwealth*, 16 Peters, 53. The power to raise and support armies is exclusively vested in Congress, and their legislation upon the subject is necessarily exclusive, and can be neither controlled nor limited by any State authority, whether executive, legislative, or judicial, for the legislature cannot deposit such a power in any tribunal whatever.

Upon this point, however, in addition to the high authority of the Supreme Court of Michigan, quoted in my former opinion, we have the deliberate and well-considered opinions of two able judges of the New York Supreme Courts, in the Seventh and Fifth Judicial Districts of that State.

In the matter of Jordan and others, Judge E. Darwin Smith, of the Seventh Judicial District, held that where, on a return to a writ of habeas corpus, a State judge or court is *judicially apprised* that the party is in custody under the authority of the United States, such judge or court can proceed no further. The prisoner is then within the dominion and exclusive jurisdiction of the United States. 2 Am. L. R. 749.

After speaking of the case of *Ableman* v. *Booth*, which he approves, the learned Judge says: "Upon this theory every citizen owes to his country a divided duty—to the National government he owes *allegiance* and the duty of submission and obedience to its laws, and to the State government obedience and submission to its laws; each in their proper sphere. Within the sphere of the National government its judiciary protects his rights, and vindicates his wrongs; and within the sphere of the State government its judiciary enforces his duties, protects his rights, and gives redress for the injuries he may receive in person or property." Id. 758.

"In many localities in this country," says the learned Judge, "aside from the States which have professedly renounced the national authority, it is notorious that there are some evil-disposed persons, in sympathy with the enemies of the country, who are opposed to the war, and who evince a spirit of hostility to the government by hindering enlistments and volunteering; by enticing enlisted men to desert; in secreting deserters; and resisting by force their arrest and return to the army; and who by opposition to the draft, and various other modes of proceeding, are seeking to defeat the operations of the government in conducting the war. It would be surprising if such men could not find some convenient judge who would issue writs of habeas corpus, and, by this process, discharge all persons brought before him, on the ground that the laws of Congress authoriz-

[Kneedler *v.* Lane et al.  Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

ing enlistments or the draft, and arrest of deserters, and, perhaps, the war itself, were unconstitutional, and thus give the color of law to their disloyal acts and proceedings." Id. 759.

An opinion of a similar tenor was delivered by Judge Bacon of the Fifth Judicial District, in the matter of Charles E. Hopson, an abstract of which was furnished by the reporter, Hon. A. L. Barbour.   Mr. Mitchell, one of the editors of the "Register," kindly furnished me with the full opinion of Judge Bacon, which is a very able one.   3 Am. Law Register, N. S. 189.

I think, therefore, the argument drawn from the use of the habeas corpus by State courts, to take persons out of the custody of officers of the United States, acting under the authority of an act of Congress, fails entirely, and shows conclusively that the present mode of proceeding by injunction to effect the same object cannot be supported.

I am also of opinion that the words of our act of Assembly do not cover these cases, as I have said in my former opinion. Before the act of 1836, it is conceded that no such power was reposed in any court in this commonwealth; and can it be supposed that the legislature of that day intended to grant to any court the authority to interpose the State power to prohibit the execution of an act of Congress under the words "the prevention or restraint of the commission or continuance of acts contrary to law, and prejudicial to the interests of the community, or the rights of individuals?"   The legislature could not give to any person or tribunal the power to stop the execution of an act of Congress.   If they could not do so in direct terms, they could not do it under the cover of general expressions; and they would not do so when the rebellious action of South Carolina in attempting to prevent the execution of the tariff laws had been so lately rebuked by the hero of New Orleans, whose action was sustained and approved by the people of Pennsylvania without distinction of party.

I am also of opinion that this is not a proper subject for the jurisdiction of a court of equity; and upon all these grounds, I am in favor of dissolving these injunctions—which never should have been granted.   No security, as required by the terms of the preliminary injunctions, has ever been entered by either of these complainants, nor have, of course, any writs of injunction been taken out in either of the cases, and no reason has been assigned for this omission to bring home to the defendants the action of this court.   This gives us full possession of the case, and in the language of Chancellor Kent, "The granting and continuing of the process (injunction) must always rest in the sound discretion of the court."   2 John Ch. 205.

I am also of opinion, that my brother Strong was entirely right in receiving the motions to dissolve the injunctions at

[Kneedler *v.* Lane et al.. Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

Nisi Prius, being the only place in which they could be made, and in calling in his brethren to assist him in hearing the rules, and that the motions were perfectly regular, requiring no affidavits—for the whole case turned upon the bills and affidavits filed by the complainants. The views expressed by my brother Strong, as to the entire regularity of the whole proceeding, I concur in. I was, therefore, for entertaining the motions, and am now for dissolving the injunctions.

The Southern secessionists contended that their allegiance was due to the States, and overpowered any duty which they owed to the United States of America, and this mischievous heresy has led to the present causeless rebellion, and has made traitors of its blind and reckless supporters. The allegiance of every American citizen is due to his country, the United States—if a native, by his birth; if naturalized, by the very terms of the Constitution and the express words of the acts of Congress which make him a citizen of the United States. Each citizen has therefore the same common country, which he is bound to serve and defend as far as he is capable.

The mottoes of the Father of his country were, "*Deeds not words*," and "*For God and my country.*" Sparks' Life of Washington, 522. At his death, the Senate of the United States, in addressing President Adams, expressed to him "their deep regret for the loss their country sustains in the death of General George Washington." And in his reply, the President said, he received with the most respectful and affectionate sentiments, in this impressive address, "the obliging expressions of your regret for the loss our country has sustained in the death of her most esteemed, beloved, and admired citizen."

In his Farewell Address, this great man, after expressing the debt of gratitude he owed to his *beloved country* for the many honors conferred upon him, uses this language to his fellow-citizens: "The unity of government, which constitutes you one people, is also now dear to you. It is justly so." "Citizens by birth or choice of a common country, that country has a right to concentrate your affections. The name of American, which belongs to you in your national capacity, must always exalt the just pride of patriotism, more than any appellation derived from local discriminations."

The armies of the Union are not fighting for any single State, but they are fighting for their common country, the United States of America, as Americans; and those who have perished in this contest for the preservation of the Union have died under the National flag, which I trust will soon wave over the whole undivided territory of our glorious and once happy Union.

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

Concurring opinion by AGNEW, J.

These bills were presented to Mr. Justice Woodward at Nisi Prius, who called in his brethren to sit with him. The bills were presented on behalf, also, of all other citizens entitled to the same remedy, and prayed that the defendants, as officers of the draft, should be restrained "*from further proceeding with or under the enrolment, requisition, and draft of citizens of this Commonwealth.*" All of the judges delivered opinions, and a majority directed a preliminary injunction as to the complainants specially.

Afterwards the solicitors of the defendants, representing the government in this behalf, but who had not appeared at the argument, moved the Court of Nisi Prius, Mr. Justice Strong then occupying the bench, to dissolve the preliminary injunction on the grounds of a want of jurisdiction, that the bill will not lie for a *tort* only *in posse*, and that the law for enrolling the national forces is constitutional, and ought not to have been arrested and the officers exposed to punishment.

It is objected *in limine* that the preliminary hearing having been before a full bench, it is incompetent and indecorous in a single judge at Nisi Prius to entertain the motion to dissolve, without new facts arising in the cases.

By the constitution of the Nisi Prius it is a court of but one judge, and he sits singly to hear all cases at law and in equity. It is true the bench is filled by alternation, but the court remains always the same, though the person changes. The motion was made to the same court, though to a different individual, and therefore he was not incompetent to receive it. Being made, certainly it was not indecorous to call in all the judges to hear it. This only exhibits the deference of the judge to his brethren. Had Mr. Justice Woodward decided the case alone, as he could have done, certainly it would not have been incompetent or indecorous in him to rectify his own error, if he had become satisfied he had committed a pernicious mistake. I think I can safely say his love of justice would have caused him to do so at once. I can perceive no reason why the whole bench should not do the same. Then why should a difference in the sitting judge cause a different result? or why should the doors of justice be open under one judge and closed under another?

The case was there pending, having reached no final judgment. In fact the record shows that the complainants had not given security, and the injunctions have not been issued. No real harm can be done the complainants, while the government is suffering from a hurtful precedent. The proceeding is in chancery, and allows the largest discretion to reach justice. If the court had summarily interposed between the law and its

execution, stopping the machinery of government with a sudden jar, it was as much the duty of the court to retrace its steps hastily, when convinced of error, as it certainly is a sentiment of patriotism and courtesy to the Federal government.

It is true, as a general rule, that a court will not be moved summarily to dissolve an injunction without a suggestion of new facts, and will leave the party to an issue formed in the due course of pleading. The learned arguments to prove what is not denied can scarcely be deemed necessary. But this is no such case, and cannot be disposed of by such a rule. It touches the vital powers of the government, arrested violently in their execution by a State tribunal at a time of great peril. The government was not represented at the preliminary hearing, and ought not to be prejudiced by the fault (if any) of its agents. Government, which acts only through agents quickened by no personal interest, is never to be considered derelict where the default is still open to correction. No new facts need be alleged. The facts of the bill are not denied. It was the conclusion only stated in the bill which was denied. The alleged error was patent upon the face of the bill. The court heard but one side, the opponents of the law. The hearing took place in the midst of an exciting political campaign, when the spirit of party was assailing the law with furious lashes, and vigorously hounding on all its own adherents to the cause to be in at the death. The decision was by a bare majority, against the earnest dissent of two judges, and partially established non-coercion, a doctrine rooted in, and half-brother to secession. The late Chief Justice, whose honest mind, I have no doubt, felt penetrated by these surroundings in delivering the opinion of the majority, had expressed some distrust of his own convictions, and conceded that further argument on final hearing might possibly change the result.

Under these circumstances, and in a cause of such momentous importance, the majority planting the decision upon a gross violation of the Constitution by the people's representatives, never was a judge more justifiable by sound discretion, exalted patriotism, high decorum, and purity of purpose, than was the judge ordering this motion to be heard before us all. In this he was virtually approved by all, for none of us refused to sit.

We heard the case, and now it must be decided. Shall we refuse to restore the Federal government to its rightful position on a mere technicality? We know it is only a rule of procedure to protect the court against the annoyance of defeated suitors. Shall we stick in the bark when we know the only true question raised in the bill itself is the rightful power of Congress to pass the law? The complainants must stand

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

on this ground at last in the final decree.   What new fact can be urged?   It is admitted the answer cannot deny the facts. The government relies only on its rightful authority to do the acts alleged in the bill.   The issue is the invalidity of the law, and this appears now as fully as it can appear hereafter.   Then why this labor upon a point which involves nothing and decides nothing?   When we have labored with all our powers, in the end all we can say is, *mons laboravit et mus cucurrit.*

But, on the other hand, if we permit this unsubstantial technicality to prevail, what is its effect?   It leaves the draft officers liable to a penalty in either way.   If they disobey the injunction, they will be attached.   If they obey it, they will be displaced.   In either direction they must suffer.   If we have fallen into a grievous error, shall we not retrace our steps and relieve the officers from their predicament and the government from injustice?

We make no precedent for ordinary suitors.   On the contrary, we tell them it cannot be drawn into one, for while we recognize the rule, we declare it has no place here before us as chancellors, in a matter of pure discretion so vital to the Federal government, and under the circumstances surrounding the case.   If others, professing and doubtless possessing equal patriotism, are willing to permit this merest shadow of a technicality to interpose between the court and restitution of the rights of the government, I regret they so magnify art above justice, but I cannot adopt their views.

It is said that the new member of the bench is bound by the rule of *stare decisis.*   I bow to this safe maxim wherever it applies, and conceive it would be sad indeed if the reputation of this court were to suffer by my breach of it.

But it is admitted that on a final hearing I must decide as my views and conscience dictate.   And why not now?   I find the case before me, and I certainly cannot decide it against all my convictions of law, duty, and patriotism.   But it is thought it would be asserting a principle contrary to the genius of the Constitution and the safety of society that causes should not be governed by solemn decisions, but the result of elections. I question the propriety of introducing the results of the election here, and think that the application of such a test, which leaves us without a judicial mind, and makes us the mere registers of popular edicts, savors more of offence than argument.

What mind can for an instant suppose that any bench, having a proper self-respect, can be governed by the popular upheavings and reverse a solemn decision to satisfy popular demands?   It needs no argument to prove to sane men that such a principle would do violence to public security and ju-

dicial propriety. By what warrant of position or propriety can any one say that the opinions of any member of the bench are not the result of sound law and pure motives, but the registration only of popular edicts? What has turned the thoughts of any one into such a channel, instead of following the obvious open path of decorous inquiry? Is this such a case? Do we violate any principle here?

On what principle, therefore, is *stare decisis* quoted to me? Is it merely to sustain the decision of a bare majority against a strong dissent, establishing the doctrine that national forces cannot be raised to suppress insurrection, nor, indeed, used for such a purpose; made in a one-sided hearing of the opponents of the law, in a preliminary way, during a time of high excitement, when partisan rage was furiously assailing the law—a decision tending to encourage a general rush into the court, and to put an end to the levying of troops, and inciting to forcible resistance under a persuasion of the law's invalidity? The decision has become no rule of right, and has fixed no status of society, while it is founded, in my judgment, in most pernicious error. Surely this is no case for *stare decisis*.

I make no point of the popular verdict in this State. I shall not write it up, and I am sure I am under no necessity to write it down.

To prevent misconstruction, I desire to say I refer to the pressure of the late political canvass upon the former decision, only to indicate the unconscious influence of preconceived opinions. These predispositions seem to operate as if by a law of our nature; and are exemplified even in religion, which descends from father to son, and often controls the judgment, rendering it blind to the most palpable errors. A like influence is also to be found in the prevalence of national prejudices and errors.

Believing that law, duty, patriotism, and justice require the preliminary order to be rescinded, I proceed to the grounds which, in my judgment, place the power of the government above successful disproof.

The bills before us pray for relief against the act of Congress of the 3d of March, 1863, for "enrolling and calling out the national forces," politically known as the conscription law. The ground of relief is its alleged unconstitutionality.

The essential features are these: It ascertains who shall be liable to military duty, and provides for their enrolment; it authorizes a draft by lot of the number required by the President to be called into service, and provides for enforcing the call; and it empowers the President to assign them to service as he shall determine.

Is this mode of raising a national military force to suppress the existing rebellion unconstitutional?

[Kneedler *v.* Lane et al.　Smith *v.* Lane et al.　Nichols *v.* Lehman et al.]

The presumption is that Congress has acted within the scope of its powers; and, as said by Chief Justice Marshall, in *Fletcher* v. *Peck*, 6 Cranch, 87, "it is not on slight implication or vague conjecture the legislature is to be supposed to have transcended its powers and its acts considered void." The opposition between the Constitution and the law should be such that the judge feels a clear and strong conviction of their incompatibility with each other.

It is conceded that the power of Congress is twofold—first, to raise national forces under the clause, "to raise and support armies;" secondly, to call forth the militia, "to execute the laws of the Union, suppress insurrections, and repel invasions." But the constitutionality of the law is denied on the grounds that national armies can be raised only by voluntary enlistment, and not by draft; and that this law is not an exercise of the power to call forth the militia, but comes into conflict with the clauses in the Constitution relating to the militia. The grounds of conflict alleged are: that national forces cannot be raised to suppress insurrections, but the militia must be called forth; that this law covers the whole ground of the militia, exhausting it entirely, and is therefore an unauthorized substitute for the militia of the States, annulling the remedy provided by the Constitution for insurrection.

Can the national armies be raised or recruited by draft?

That the United States are a nation, and sovereign in the powers granted to them, is not denied. Their national characteristics are seen in the powers themselves, and their supremacy provided for in the instrument. They possess all the functions of a nation in the law-making, executing, and judging powers.

We cannot conceive of a nation without the inherent power to carry on war. The defence of person and property is a right belonging by nature to the individual and to every individual, and is not taken away by association. It therefore belongs to individuals in their collective capacity whenever thus threatened or assailed. The Constitution, following the natural right, vests the power to declare war in Congress, the representatives of the people. It is noticeable that the Constitution recognizes this right as pre existing, for it says, "to *declare* war," which presupposes the right to *make* war. The power to declare war necessarily involves the power to carry it on; and this implies the means—saying nothing *now* of the express power "to raise and support armies," as the provided means.

Vattel (Book I., chap. 2, sec. 18), after proving the national duty of self-preservation, growing out of the nature and obligations of association, says: "Since, then, a nation is obliged to preserve itself, it has a right to *everything* necessary for its

preservation.  For the law of nature gives us a right to everything, without which we cannot fulfil an obligation; otherwise it would oblige us to do impossibilities, or rather would contradict itself, in prescribing us a duty and at the same time debarring us of the only means of fulfilling it."

Burlamaqui, in his Politic Law (part 4, chap. 1, sec. 11), also says: "The law of God no less enjoins a whole nation to take care of their preservation than it does private men."

Again, in section 12: "Herein it is certain that the sovereign, in whose hands the interest of the whole society is lodged, has the right to make war.  But if it be so, we must of course allow him the right of employing the *several means* necessary for that end.  In a word, we must grant him the power of *levying troops* and obliging them to perform the most dangerous duties, even at the peril of their lives.  And this is one branch of the right of life and death which manifestly belongs to the sovereign."

The right to the means carries all the means in possession of the nation.  Every able-bodied man is at the call of the government; for assuredly, in making war, as there is no limit to the necessity, there can be no limit to the force to be used to meet it.  Therefore, if the emergency require it, the entire military force of the nation may be called into service.

But the power to carry on war, and to call the requisite force into service, inherently carries with it the power to coerce or draft.  A nation without the power to draw forces into the field in fact would not possess the power to carry on war.  The power of war without the essential means is really no power—it is a solecism.  Voluntary enlistment is founded on contract.  A power to command differs essentially from a power to contract.  The former flows from authority; the latter from assent.  The power to command implies a duty to obey, but the essential element of contract is freedom to assent or dissent.  It is clear, therefore, that the power to make war without the power to command troops into the field, is impotent; in point of fact is no governmental power, because it lacks the authority to execute itself.

So much can be argued conclusively, from the fact that the Union is a government of national powers, and has the express authority to declare war, and provide for the common defence and general welfare.

But when we reach the express grant of the means of making war, we find it a general grant of the power "to raise and support armies," without any exception as to the extent, the mode, or the means, only that appropriations for the purpose shall not be made for more than two years, which strengthens the grant in every other respect.

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

Here then is a grant in the broadest language to raise armies, and the purposes (of which I shall say more presently) are vital and fundamental.   What is the rule of interpretation to be applied as settled by the Federal judiciary?

In *Gibbon* v. *Ogden,* 9 Wheaton, 188, Chief Justice Marshall says: " We know of no rule for construing the extent of such powers, other than is given by the *language* of the instrument which confers them, taken in connection with the *purposes* for which they were conferred."   Then, speaking of the misapplication of the doctrine of strict construction, in language which seems as if .written for this time and occasion, he says: " If they contend for that narrow construction which, in support of some theory not to be found in the Constitution, would deny to the government those powers which the words of the grant, as usually understood, import, and which are consistent with the general views and objects of the instrument—for that narrow construction which would cripple the government, and render it unequal for the objects for which it was declared to be instituted, and to which the powers given, as fairly understood, render it competent—then we cannot perceive the propriety of this strict construction, nor adopt it as the rule by which the Constitution is to be expounded."

In *Martin* v. *Hunter,* 1 Wheaton, 304, Mr. Justice Story said: " This instrument (the Constitution), like any other grant, is to have a reasonable construction, according to the import of its terms; and when a power is expressly given in general terms, it is not to be restrained to particular cases, unless that construction grows out of the context expressly or by necessary implication."

It is conceded that in construing the Constitution we must take it as a whole, and not confine the question to a single isolated grant of power.   But where a general power is vested in plain and absolute language, without exception or proviso, for high, vital, and imperative purposes, which will be crippled by interpolating a limitation, the advocate of the restriction must be able to point out somewhere in the Constitution a clause which declares the restriction, or a higher purpose which demands it.   But, by so much more that the life of a nation is greater than the life of an individual, which may be taken to preserve it, so much greater is the high purpose of raising an army to preserve the nation than the protection of the rights of the individual.   The minor purpose, when urged as a reason for the limitation, cannot therefore be allowed to control the meaning of the plain language used for the major purpose.

Then the inherent powers of a nation to make war for self-preservation, carrying with them all the means of making war effective, the express power to declare war and to raise and

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

support armies, coupled with the express power to pass all laws necessary and proper to carry these powers into effect, all unite in sustaining the power to raise armies by coercion, and these are in turn sustained by the high, vital, and essential purposes of the grant. In addition, the considerations derived from the constitutional duties of the government, and the con-- stitutional restrictions upon the States, enforce this conclusion.

If, as inferred only, the Constitution denies coercion, what is its purpose in this?

The power to raise armies by draft lies somewhere—if not in the Union, it belongs to the States. But if it abide in the latter only, how is it to be used at all? They cannot declare war, for this power clearly belongs to the nation alone. They cannot make treaties, contract alliances for mutual assistance, make peace, or do any act requiring forces to answer such stipulated duties, for those powers belong to the Federal government, and are forbidden to the States. They cannot "grant letters of marque or reprisal," "keep troops or ships of war in time of peace; enter into any agreement or compact with another State or with a foreign power, or engage in war, unless when actually invaded, or in such imminent danger as will not admit of delay."

It does not belong to the States to provide for executing the laws of the Union or for suppressing insurrections. Nor does it belong to one State to defend others against invasion. Of what use, then, is the compulsory power to raise armies, to the States as such?

But it does belong to the United States to provide for the common defence and general welfare; to declare war; to execute the laws of the Union; to suppress insurrections and repel invasions; to protect the States themselves against invasions and domestic violence, and to guarantee to them a republican form of government. If we deny the Union the means of raising armies by draft, and leave coercion to the State, how are all these high Federal duties to be performed?

When it is said that the Congress shall have power to call forth the militia for *three* purposes, it is clear this is not a call by the *States* of their own militia. Congress organizes, arms, and disciplines, while it is left to the States to officer and train only. The State cannot constitutionally know when and for what purpose to call out the militia. This belongs to Congress, which has legislated, vesting the power in the President and prescribing the terms of its exercise. See acts of 28th Feb., 1795, and 3d March, 1807; Brightly's Dig. 440. He is to designate the States from which the militia shall come, and direct whither they shall go. The whole affair is national, not State.

[*Kneedler v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

The three purposes alluded to also indicate this. By what State authority will Pennsylvania draft her militia to resist an invasion of Louisiana, suppress insurrection in Florida, or execute the Federal laws in Texas. She cannot bind herself by treaty or alliance to furnish troops. She cannot throw herself back upon her powers as an independent sovereign State, for she is under the Constitution, and this vests the power over the militia for these *Federal* purposes in the Union. Nor can she limit the requisition of the President under the law. She cannot say, I will draft so many, or any proportion only. Indeed she can say nothing, for if it rested with the State alone to call out her militia to execute the Federal duties, even on the call of the President, the Union would be at the will of the State, and in no better condition than under the articles of confederation. If the executive of the State refuse to draft, supported as he might be by his own people, what remedy has the Federal government? Not even impeachment, for that would depend on the State legislature.

Then what becomes of this power to draft as residing in the State only—this *parens patriæ* power so much referred to? It is of no value to the Union, for the State is *neither permitted nor commanded* in the Constitution to use it for national purposes. It is of little value to the State, for the Federal government must protect her against invasion, and against domestic violence if her *posse comitatus* fail. Thus we have reached a point where an admitted sovereign power is sunk somehow between the two governments, and neither can exercise it for any national or valuable purpose.

It is, therefore, a strong fact in the Constitution itself, that correlative to the power of the Union to raise armies, and to organize, arm, and discipline the militia and call them forth, is the omission of all authority in the States to raise forces for national purposes; and coinciding with this, that there are constitutional restrictions incompatible with the exercise of any such power.

It is thought the drafting power is incompatible with the provision for due process of law. It would be a sufficient answer to say, this being true, that the State itself could not draft; for the ninth section of the ninth article of the State Constitution has a provision precisely equivalent, as shown by Mr. Justice Curtis in *Murray's Lessee* v. *Hoboken Land Co.*, 18 Howard, 276; the expression, " law of the land," being tantamount to " due process of law."

But it is not denied that wherever technical phrases were used, or expressions having a fixed meaning when the Constitution was ratified, we should adopt their technical or received sense. Hence we interpret " *habeas corpus*," " bill of attainder,"

" levying war," " trial by jury," by their known meaning at the time. But the language " to raise and support armies" was neither technical nor fixed in meaning as to any particular modé or means ascertained at the time, and was composed of words of ordinary import. They have no special history bearing upon their use. The power to draft is admitted in the State. When the States parted with powers contained in language apt to carry the draft, no exception was made, and due process of law was not prescribed in any particular form. On the other hand, as we have already shown, the inherent power of a nation and duty of self-preservation, the expressed grant of the power to make war, with the means of carrying it on, the duties to the nation and the States imposed upon the National government, and the duty to individuals to protect their rights guaranteed by the Federal Constitution, all give to the words their natural, general, and obvious scope.

Then how can it be said the phrase " to raise and support armies" cannot mean to include a draft, because this would not be by due process of law?

What is due process of law? Does it mean when a power is given in plain language it shall not be exercised, because no exact precedent of due process of law can be found in some antecedent form of government? Does it mean that Congress is incompetent to declare the due process of law, by prescribing a reasonable legal form of procedure through which the power is to be exercised? If so, what will become of the fugitive slave law, and all laws under those peculiar powers conferred on the General government, having (at the ratification of the Constitution) no precedent, perhaps, in the annals of any country or period? The argument which would construe the meaning of the words " to raise and support armies" by the provision for due process of law, to exclude coercion, it seems to me is unfounded in any just interpretation of the instrument.

The sum of the argument is simply this, that no mode can be used but one known before to Great Britain or the United States under the Articles of Confederation.

As to the historical argument, though charmed with the richness, fulness, and classic elegance of the effort as a contribution to legal literature, I must say the history itself leaves no impression on my mind, for several reasons. There is no special history bearing directly on the clause in question to help us out. The historian admits the power of " conscription" in the State, which, therefore, could impart it to the Union. The history of Great Britain is equivocal, and the distinction between conscription and impressment, known at the formation of the Constitution, is the strongest reason why the latter, at -least, should have been provided against. Colonial history

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

furnishes no argument, for impressment was a complaint against the king to be found in the declaration of independence; and yet no provision was introduced.   The history under the articles of confederation proves nothing, for the weakness of the confederation was one of the very reasons for forming the Constitution.   The history since its adoption is no exception; for, since 1789 until now, a conscription has never been necessary.   The war of 1812 is no exception.   So far as our territory was involved, it was a war of invasion by a distant, ocean-divided country, incapable (owing to the then state of naval affairs) of throwing a large force upon our shore, as compared with the magnitude and power of this rebellion.   It was at a period when the proportion of the population to the number needed was vastly greater, and when the spirit of union and patriotism was easily invoked against a common foe; while now, the country is a prey to rebellion, irruption, disloyalty, want of sympathy, and all the ills of an insurrection within its own bosom.   The whole current of history, therefore, proves the most incomprehensible dulness in a body of men heretofore renowned for their wisdom, in not providing against a tyranny alleged to be so gross, yet within their view; or it speaks trumpet tongued against the very interpretation it is invoked to support.

I have alluded to but not developed the Federal duty of protection to the personal rights of individuals.   The right of war is at the foundation of all governmental protection.   If the rights of citizens be invaded by foreign powers, a resort to arms is the only answer to justice denied.   If their rights be denied by States against the declared provisions of the Constitution securing equality of privilege, military force is the final remedy.   Turn to article 1, sec. 9, article 4, and to the amendments, and see how many and important are these rights.   If State privileges be denied, contracts impaired, *ex post facto* laws enforced, personal liberty abridged, the trial by jury infringed, or any other right thus secured denied, this fact brings us into the Federal courts, whose judgments become law, and therefore entitled to the aid of the military arm of the nation to compel their execution.   Let bitter inter-States controversy arise and the people become blind to justice and insensible to reason, and the value of this sovereign controlling power immediately rises to view.

Yet with the Federal Constitution before our eyes, securing to the citizen all his great and fundamental rights of personal and civil liberty, and pledging each branch of the government, by the solemn sanction of oaths and the penalty of impeachment, to the execution of its laws, it is argued that the military necessary to the final and complete protection of these liberties

cannot be given to it, but must be vested in separate State sovereignties, wanting in power beyond their own boundaries, incapable of contract by treaty or alliance, inferior in means, unpledged to Federal duty, and discordant in purpose and in action.

And on what plea is this? Forsooth, on the plea that the States are the only true representatives of popular rights—a position founded in a total disregard of the fact that in respect to the powers and duties vested by the Constitution (which, by its own terms, is the supreme law and the security of these rights) the Federal government is the first and highest representative of the popular will, as well as the strongest bulwark of popular rights. Is not the executive elected by the people, and directly responsible to them? Are not the members of the House the representatives of the people, elected by them and holding the purse-strings of the nation, thereby controlling both army and executive? Thus the people themselves control both State and Federal governments, with this advantage, too, in favor of the nation, that a majority of the whole people control it for the benefit of all, while the States are controlled by jarring and discordant interests. This argument, which thus saps the vital powers of the nation at their centre, has, it seems to me, no illustration more fitting than the fable of Æsop, in which the members are represented as rebelling against the stomach, the source of all their strength.

There are strong considerations in support of the power to draft arising in the character of that voluntary enlistment which lies at the bottom of the opposite argument.

Courtiers may whisper in the ear of royalty, the king can do no wrong. Demagogues may sound the praises of the people. But courts of justice, as well as human nature, can found nothing on the mere willingness of men to perform legal duties in the absence of the sanctions of the law. What is the true foundation of civil liberty? Why are laws and constitutions formed? For what are penalties and criminal jurisprudence established? Why are governmental powers given to protect society against sedition and insurrection? Clearly to defend man against himself.

Why does the Constitution guarantee to the States a republican form of government? Does not this import that a majority, or some large portion of the people, is potent to destroy their own liberties? Why protect the States against domestic violence, enforce the execution of the laws, and suppress insurrection by the arm of military power? Do not all these imply popular commotion and disorder, at variance with the theory of unreserved submission to the general good, and therefore at variance with popular willingness to enlist?

[Kneedler *v.* Lane et al.  Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

Then no matter how grateful the flattering incense to the pride of popular vanity, mere willingness is no substitute for authority, and no foundation for governmental power.  In the name of civil liberty and a nation's welfare, are the security and prosperity of this government to be rested on the changing passions of mankind, unsupported by a power of command?

Who are the people?   Were they those who, according to the forms of the Constitution, in 1860 chose a President?   He wields the lawful authority of the nation, yet it may be said he represents minority views, and popular willingness will thereupon refuse to enlist.   Were they those who in 1862 revolutionized the popular voice of the great States of New York, Pennsylvania, Indiana, and Illinois?   Or were they those who produced a counter revolution in 1863 in the same States, thereby reinstating popular willingness?   And remember this is no unmeaning question, when you consider the power of State executives as the exponents of State willingness.

Can it be that this Heaven-ordained Union, the light of nations, the hope of the world, the protector of States, the defender of personal rights, the guarantee of free government, shall depend for its own safety and for the performance of all its high duties on the ever-changing hues of popular opinion, or the varying moods of State executives?

When the voice of the people, through the forms of the Constitution, speaks from the ballot-box, we listen to it as the great rule of government, and submit to what it decides.   But, like every other act of power, it is potent only within the scope of its authority.   Then surely the interests of a nation have not been made dependent on the discordant tones of local divisions.  If their voices speak to us from the ever-changing spots on the chess-board of States, how shall we learn this lesson of willingness in national affairs?   Is it the intention of the Constitution that every great popular rising, founded itself upon the extremes of popular opinion, shall depend for its suppression on the unstable willingness of men to enlist?   Yet this is the doctrine which scouts the power to enforce war by arms, and rests it upon the sheer impulses of the people.   I speak of national forces, not forgetting the militia, as we shall presently see.

I deny, then, that interpretation of the Constitution which would, by mere implication, destroy its language, its design, its consistency, its wisdom, its duty, its power, and its protection ; and for myself I would protest against this suicide of national life, in the name of patriotism and civil liberty, of my country's welfare, its honor and renown.

Must we forget all history and our own short recollections?  Must we ignore that conduct of States which brought the Constitution into existence, " in order to form a more perfect union,

[Kneedler v. Lane et al. Smith v. Lane et al. Nichols v. Lehman et al.]

establish justice, *insure domestic tranquillity, provide for the common defence, promote the general welfare,* and secure the *blessings of liberty* to ourselves and posterity?" Then, after all this, must we forget the whiskey insurrection, the opposition to the embargo and to the war of 1812, the South Carolina nullification and the Dorr rebellion?

Must we blot out our own memory of the last three years, when States and people rose against the Constitution and authority of the Union, and ordained them null and void—when the ministers of justice and all Federal officers in those States resigned or were forced to retire—when the forts, arsenals and other property of the government were seized and its armies surrendered? Must we forget that when the States were first called on for troops, States not then in rebellion, through their executives, hurled back the President's proclamation into his face, and that troops sent to the succor of the government, to save its capital from capture and its archives from destruction, were murdered in the streets of a neighboring city? Are we to ignore the fact staring Congress in the face at the time of the passage of this very law, that the impulses which first drew out volunteers were dying away—that as war was prolonged, and death, disease, and discharge thinned the ranks of the voluntary element, as disasters overtook us and the scales of battle hung in doubtful equipoise, the spirit of enlistment drooped, flagged, and died away, while the ties of home and interest, and the spirit of disaffection, more potent than patriotism, asserted their sway over the remaining elements?

Shall we ignore all these speaking histories, all these bitter recollections, and the plainly-written powers of the Constitution, to trust our country to the changing, fitful moods of voluntary enlistment? Shall we throw the ability of the Federal government to make war and to execute all its high duties into the boiling caldron of party politics, watch its ebullitions, and wait to see whether the zealous abolitionist, the cautious conservative, or the non-coercionist shall succeed in the civil contest? Shall we meanwhile leave the General government, the protector of our rights, the only unit in council or action, to struggle feebly against a giant usurpation, whose clutch is upon its throat, and whose venom is penetrating every vein and fibre.

Then where, in the Constitution, does the opponent of this power find his argument? Does he fly to the letter? It is a wall of adamant to national security and State repose. Does he ask its design? It proclaims peace to the nation and safety to the State. Does he fall back on duty? It is bound all round to protection with "bands of iron and hooks of steel." But it is to none of these he flies! It is to a mere inference,

which recoils to his destruction—a barb that stings—a shaft that impales.

Finally, it is said that this law is incompatible with the provisions of the Constitution in relation to the State militia—that the militia are a State institution continued by the Constitution, which cannot be taken away, but only regulated in the mode provided—that this law covers the whole ground of the militia and exhausts it entirely—that therefore it is an unauthorized substitute for the militia, annuls the remedy provided by the Constitution for insurrection, and substitutes a new and unprovided one.

This whole argument proceeds upon the basis that national forces cannot be raised to suppress insurrection, and that it can be suppressed only by the use of the State militia, and upon the further ground that the military element of the population cannot be exhausted in the execution of any power granted to the Federal government, even when essential to its execution.   It therefore substantially denies the supremacy of the Federal over the State law, when the subject-matter, viz., the military element, is one over which they have concurrent jurisdiction.

If it be true that insurrection *can* be suppressed by the use of the national forces, then the power to draft to suppress insurrection falls within the power to raise and support armies, as is already shown.   If it be true that insurrection can be suppressed *only* by the use of the militia, then it is also true that the militia only can be used to .execute the laws of the Union and to repel invasions, for the same argument which proves the incompatibility of the one, necessarily proves the incompatibility of the other two, for all are engrafted upon the same stem.   The incompatibility supposed to arise out of the maxims " *expressio unius, est exclusio alterius*," and " *expressum facit, cessare tacitum*," applies to the first and last terms of the clause, as well as to the middle.

Now, clearly it is not the intention of the Constitution, if its own laws be resisted or an invasion be attempted, to forbid the use of the national forces raised and in readiness for the emergency, and to require the government to await the tardy process of calling out the militia.   Yet the advocate of this incompatibility must submit to this conclusion, for his argument proves all these terms in the clause to be upon the same footing.

These militia, at times, may be a great additional aid to the national forces, but surely are not intended to supersede them. Then, on what different footing does insurrection stand?   None in the Constitution, for there it is only one of the triple prongs of the same power.   None in the urgency, importance, or

[Kneedler *v.* Lane et al.    Smith *v.* Lane et al.    Nichols *v.* Lehman et al.]

necessity of the duty. Invasion may come suddenly from a foreign foe, while enforcement of the laws is twin brother to suppression of insurrection, for both suppose breach and resistance to law.

Neither the reason of the thing, nor the obligation of the government, admits of the enforcement of any of these three duties being confined to the militia. It owes security to the nation collectively, its laws, its authority, and its soil. It owes protection to the States individually, their territories, their domestic tranquillity, and their freedom of government. Are the arms of the Union powerless for these purposes, and can the militia only perform these duties? The question answers itself; to state the case is to refute it.

The assumption is also contrary to ancient practice and uniform construction. By the act of 3d of March, 1807, section one, Congress provided for the use of both land and naval forces to suppress insurrection. The act of 2d of March, 1833, section five, provided for the use of the same forces when the laws, their execution, or the process of the courts are obstructed by military force in a State. During the nullification movement, President Jackson garrisoned Castle Pinkney and Fort Moultrie with regulars under the immediate command of General Scott, and anchored vessels of war in the harbor of Charleston under the orders of Commodore Elliot. In latter days the army has been used in Kansas and Utah. Who ever intimated that these laws and executive acts were unconstitutional, and that the militia alone should have been called for? But *tempora mutantur, &c.*

The truth is, that instead of the power to call forth the militia being in exclusion of any of the preceding grants of the power of war, to raise armies, maintain a navy, &c., or operating as an exception or proviso, it is a continuation of the enumeration of powers, and is an additional grant subsidiary to the former, as its place in the section, its terms, its design and the subject-matter, all import. While the framers of the Constitution intended that the nation should possess the primary and essential means of self-preservation in its fullest extent, by the power to declare war, raise armies and maintain navies, and provide for the common defence, &c., they also foresaw, through the genius of the people, the nature of the government as a representative democracy, and the force of other powers and limitations operating; that it would be unlikely a large standing army would be always on foot, and the nation thereby ready for every emergency. The election of representatives being biennial, the origination of revenue bills confined to the representatives, appropriations to the army limited to two years (or one Congress), and the spirit of oppo-

sition to standing armies, made it unlikely that a sufficient regular force should be ever ready to meet unexpected opposition to law, powerful insurrections, and sudden invasions. No better illustration need be furnished than the actual state of the national forces at the time of the whiskey insurrection, and at the outset of this rebellion, and even at this hour, if we reduce the force to the enlisted regulars, as the argument calls upon us to do. Hence the power to call out the militia in the three cases was added. Addition is not exclusion, and it does not say, You *shall not* use the national force because you *may* use the militia.

The constitutional authority to use the national forces creates a corresponding duty to provide a number adequate to the necessity. The duty is vital and essential, falling back on the fundamental right of self-preservation and the powers expressed to declare war, raise armies, maintain navies, and provide for the common defence. Power and duty go hand-in-hand with the extremity, until every available man in the nation is called into service, if the emergency requires it, and of this there can be no judge but Congress.

They may proceed, therefore, to the exhaustion of the whole element from which the State draws its militia, for the people under the two powers are the same; while the supremacy of the national power, provided in section 2 of article 6, necessarily draws to itself the whole number, if required by the exigency, to the exclusion of the State power.

And, in reason, why should a major power be restricted by a minor. The power to raise armies comprehends for its purpose the whole scope of the purposes of armies, while the authority to call out the militia is confined to the enumerated three.

But it is a mistake, in fact, to say this law exhausts the militia. It enrolls probably all, for how can any be drafted without all be known? But the draft is confined to so many as are needed for the emergency, while the others remain in the militia. And if you deny the power to repeat the draft, what is that but to say your force shall not increase with the necessity?

Nor is it true that the enrolment under this law exhausts the militia. Neither the law of Congress, nor the laws of the State, so far as we know them, have enrolled all able-bodied men capable of militia duty. A wide margin yet exists in the law of the nation, but we do not hear of this margin being written all over in the seceded States.

As to the objection to the 13th section, providing the punishment of desertion for those who fail to appear, it is only necessary to say we cannot presume the complainant will be

guilty of failing to perform his legal duty subsequent to the draft, when he finds the law is valid which drafts him.   He asks us to relieve him from the draft, not from a military trial for misconduct.   Whenever he chooses to incur the proposed penalty for disobeying a valid law, it will be in time for the proper tribunal to arrest an illegal mode of punishment.

The question of jurisdiction is unnecessary to a decision. The point is too important, the cases too numerous, and the labor too great.   It should therefore be left for a decision when it shall have to be met.

For all these reasons, I concur in rescinding the order for a preliminary injunction.

C. J. WOODWARD and J. THOMPSON dissented from the ruling of the court, and concurred in the following opinion by

WOODWARD, C. J.—The judgment of this court, pronounced at Pittsburg on the 9th of November last, against the constitutionality of the act of Congress, of March 3, 1863, which is commonly known as the conscript law, was as regular, fair, and solemn a judgment as this court ever rendered.   The parties had a full opportunity to be heard.   The defendants did not avail themselves of it, for they persistently refused to appear either by themselves or their counsel, to argue the single question involved, or to object to our jurisdiction, or to the form of proceeding.   On the 23d of September, when the court assembled to hear the argument, we required proof of notice to counsel to be filed of record, and waited the return of a special messenger whom we dispatched in unsuccessful search for the counsel.   The argument was not permitted to proceed on behalf of the plaintiffs until more than usual pains were taken to secure to the defendants their constitutional right to be heard. But the court was treated with studious contempt.   The defendants did not condescend even to allege the constitutionality of the act of Congress.   We have no right to hold counsel responsible for this treatment, because counsel generally act as they are acted upon, and the legal presumption is, in this instance, that they did not appear because they were instructed not to appear.   The judgment was delayed for six weeks, an interval which bore the case beyond the excitements of a pending political contest—gave judges ample time for reflection on the grave question to be decided, and afforded the defendants space to repent of their contumacy, and to apply for leave to be heard, or to submit what we never refuse to receive—a printed argument.

Notwithstanding all this care and deliberation on our part, .we were deprived of the assistance we were entitled to have from the competent counsel of the defendants.   A party who

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

has full opportunity to be heard is always treated as if he had been heard. He has had his day in court, though he has not improved it. The judgment we pronounced, therefore, was as binding upon the defendants as if they had been heard. It was binding upon all the citizens of the State, and was the highest judicial evidence that they yet have that the conscript law was and is null and void. The judgment was subject to review by the Supreme Court of the United States; not indeed in its present form, for the decree of a special injunction, though it involve the decision of the constitutional question by the whole court, is what is technically called an interlocutory decree, and an appeal to the Federal court lies only from judgment or decree, which is final as well as adverse to the Federal government. It was easy, however, for the defendants to put the record into shape for review. Upon filing their answers to the bills of the plaintiffs the court could have made their interlocutory decree final, without further argument or delay, and thus the record could have been got into the Supreme Court of the United States before the beginning of their present term, last month. Or, if the court had desired reargument on the motion for final injunction, that could have been had while Judge Lowrie was still in office and in time for review in the Federal court early in the present term. No doubt delays were possible, if the purpose was to delay and not to speed justice; but it is equally clear that had there been any desire to obtain the opinion of the court of last resort, here was a good opportunity to obtain it.

But though the court sat at Pittsburg a week after each judge had delivered an opinion, and the interlocutory decree had been entered, and though the commission of Chief Justice Lowrie did not expire until the first Monday of December, yet no motion or effort was made by the defendants to prepare the record to be reviewed; no reargument was asked for in this court, no explanation or apology for the non-appearance of the defendants was offered.

After Judge Lowrie was out of office, to wit, on the 17th day of December, the defendants, by counsel, appeared before Judge Strong, at Nisi Prius, who had been assigned to that court for that month, and moved to dissolve the injunction. This motion was grounded on no answer, plea, demurrer, affidavit, or reason filed of record. It is understood that plaintiff's counsel had notice of the motion, and appeared and objected to it, but it was granted, and the other members of the court summoned to an argument upon it on the 30th of that month. When it came up before a full bench on that day, plaintiff's counsel again objected to our entertaining the motion, but the argument of the question of practice, as well as of the

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

constitutional question, was ordered by a majority to proceed, and we heard counsel on both sides on the three questions "of the regularity of the motion to dissolve," the constitutionality of the act of Congress, and the jurisdiction of a court of equity to grant relief by injunction.

This proceeding is so extraordinary, that I have felt it my duty to mark the several stages of its progress, and to express, with all possible brevity, the opinions of my brother Thompson and myself on the three questions submitted.   And first as to the motion to dissolve.   The Nisi Prius is held by the several judges of this court alternately, month by month, when not in session in other parts of the State—it is ordered by statute to be held by a single judge; but a practice has grown up of late years, when a very important question is presented to the Nisi Prius judge, for him to assemble the whole court to hear the argument—a practice which is not forbidden by statute, and has some important advantages.   In injunction cases, and especially where the motion for a special injunction involves the only question that is to be decided, and which must be decided speedily to be of any effect, the practice has the advantage of giving the parties the benefit of the opinion of the whole court, without appealing to the court in banc, and it speeds the justice which parties seek.   But when the court hears such cases, it never rehears them unless a reargument be specially ordered.   Their decision, though docketed in the Nisi Prius, is really a decision of the Supreme Court, and is published among the authorized decisions of the court. *Cooper's Case*, reported in 9 C. 278, and *Ewing* v. *Thompson*, 7 Wr. 372, passed in this way, under the former of which two millions of property are held and enjoyed, and under the latter of which the title to the office of Sheriff of Philadelphia for the time being was settled.   Many other cases have been disposed of in the same manner.   In this manner this constitutional question was tried and decided.   The plaintiffs having filed their bills, moved before me, at Nisi Prius, for special injunctions, which motion was argued, as before stated, before the whole court, and decided by five several opinions of the judges, delivered *seriatim*, and which the State reporter has already given to the public.

I have said all the citizens of the commonwealth were bound to respect that decree.   I include, of course, the judges of this court.   A dissenting judge is as much bound by the decrees and judgments of the majority, regularly entered, as the majority themselves.   In the case of *Gratz* v. *The Pennsylvania Railroad Company*, 5 Wright, 447, where the opinion was delivered by my brother Strong, the dissenting judge considered the constitutional guarantees of the sinking fund of the State pal-

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

pably violated, and filed a dissenting opinion which can be read in the *Legal Intelligencer* of December 20th, 1861, but which concluded with these words: "That judgment" (the majority opinion) "is the law of the case to which I shall always hold myself and all other men bound, as much as if it had received what I have been unable to give it, the approbation of my conscience and judgment." That I believe to be the true doctrine as uniformly recognized in this court heretofore, and I am sure it is essential to the dignity and efficiency of the court.

Upon this principle I maintain, then, that a dissenting judge cannot, upon the same state of record and of facts on which the majority have granted an injunction, dissolve that injunction, nor set the majority to reviewing their decision. If he may, it is apparent that a dissenting judge may undo the work of the whole court, or, what is worse, make them go over the same ground again and again.

New trials and re-arguments can only be ordered by the court who first heard the case. These defendants should have applied to the court who granted the injunction for their motion to dissolve it, upon the same state of facts on which it was granted; and had they done so they would no doubt have been required to purge themselves of the contempt of which they had been guilty, and to exhibit some grounds for their motion.

I do not deny that a judge at Nisi Prius may dissolve a special injunction, upon coming in of the answer to the plaintiff's bill, provided it be a direct and full denial of the equity alleged, or upon an affidavit disproving the plaintiff's equities, for then the record presents substantial grounds for him to proceed upon. But where the record remains precisely as the court in banc left it—no new fact alleged, no equity denied—I hold that a single judge at Nisi Prius has no right or power to question the decree, in behalf even of the most respectful defendants, much less in behalf of defendants who, without appearing in obedience to our subpœna, or alleging the constitutionality of the act of Congress, or denying the equity on which the plaintiffs stand, simply *demand* that we dissolve the injunction most deliberately granted.

I have heard it said during the argument that a motion to dissolve an injunction is always in order as a matter of course. This is a great mistake. Sometimes a chancellor having granted a final injunction without argument, or upon a very partial hearing, will entertain a motion to dissolve, to give the parties an opportunity to be fully heard, but the general rule is (and if ever there was a case in which it ought to be observed, this is that case) that a motion to dissolve will only be entertained after answer or plea, or upon affidavit impeaching

the equity of the bill. In Eden on Injunctions, 1 vol., 144, we read : " This order (to dissolve) will not be made without an affidavit in answer to the material allegations of the bill, and several of the motions upon this subject stood over to give the defendants time to file satisfactory affidavits." And again, on p. 145 : " If the answer contains a sufficient defence to the case stated in the bill, the injunction will be dissolved. So where a plea is allowed, there is ordinarily an end of the injunction, but not always, and the court has said that an injunction is not absolutely dissolved on the allowance of the plea, but only *nisi*, because there may be some equity shown to continue it." This text of Eden is supported by reference to the best English authorities. The American authorities are full to the same point. In *Read* v. *Consequea*, 4 Wash. C. C. R. 174, Judge Washington said : " The motion which is now made to dissolve the injunction absolutely without the answer of the defendant being filed, is altogether unprecedented. If the injunction be granted till answer and further order, which is the usual form, it is never dissolved until the answer comes in, even although the defendant should live abroad, and the motion is accompanied by an affidavit to support it. In this respect the practice of the Court of Chancery and of the Court of Exchequer in England is the same." With reference to the point of practice suggested by Judge Washington, I may remark that in the case before us the injunction was not granted subject to further order. The legal effect of it must be, therefore, that it was granted until the coming in of the answer.

Where an answer plainly and distinctly denies the facts and circumstance upon which the equity of the bill is based, the injunction will be dissolved. *Mene* v. *Ferrel*, 1 Kelly's R. 7. But an injunction will not be dissolved, as a matter of course, on the coming in of the answer denying the equity of the bill, if the complainant has adduced auxiliary evidence of his right. *Orr* v. *Littlefield*, 1 Woodbury & Minot's R. 13. In order to warrant the dissolution of an injunction upon bill and answer, it is necessary that the answer should deny all material allegations of the bill with the same clearness and certainty as they are charged. *Buckner* v. *Breine*, 9 Smedes & Marsh, 3 and 4. A denial from information and belief is not sufficient. 1 Hopkins, 48, and see 1 Paige, 103 and 311, and 3 Sumner, 78. Nor an evasive or contradictory answer—1 Bland, 195 and 199 —nor an answer merely literal, which does not traverse the substance of the charges. *Everly* v. *Rice*, 3 Greene, 553. I refer also to the numerous cases to the same effect which are cited in the notes to 1st Eden on Injunctions, and in the 2d vol. of U. S. Equity Digest, from page 83 to page 92.

These cases, from nearly every State in the Union, settle

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

with singular harmony the practice in injunction cases on the point now under consideration. If anything can be supported upon authority, they do establish, beyond all cavil or doubt, that an injunction granted after a full hearing and great deliberation, is not to be dissolved, either by a single judge or the whole court, upon mere motion, without answer, plea, or affidavit. And why should a court having any pretension to stability be expected to render a different judgment, on precisely the same state of record and of facts, in January from that which they rendered in November previously?

It is another principle of equity, that favors are not to be granted to a party in contempt. Who does iniquity shall not have equity has long since crystallized into a maxim. When the defendants place themselves erect in court, and do what other defendants in such cases are required to do—answer the bills that have been filed against them—it will be soon enough for them to move for a dissolution of the injunction—it will be as soon as they will deserve to be listened to.

It cannot be said that any great public interest demands the entertainment of this motion, for the defendants have not been restrained from executing the conscript law against the three plaintiffs even, much less against any other citizen. What the public interest demands is a decision of the constitutional question in the Supreme Court of the United States—a decision which the President publicly declared he would facilitate—and which our ruling afforded the defendants an opportunity to obtain. But instead of shaping the case for that court, they have taken the very course to keep it out of that court, and the country is tortured with doubts and fears about drafts, which a decision of the constitutional question by the ultimate tribunal would relieve. Why should not such a decision be facilitated? Is the result feared? Suppose our judgment should be affirmed and this conscript law, so uncongenial to the spirit of our institutions, should be set aside, who does not see that civil liberty would gain a new guarantee, whilst the government, remitted to the true constitutional mode of raising armies by voluntary enlistments, would strengthen itself in the affections of the people, by exercising the war power in a manner agreeable to them.

The time and manner of bringing forward this motion would seem to indicate that it was a sort of experiment upon the learned judge who has just taken his seat as the successor of Judge Lowrie. Does anybody suppose it would have been made if Judge Lowrie had been re-elected? I presume not. Are we to understand, then, that whenever an incoming judge is supposed to entertain different opinions on a constitutional question from an outgoing judge, every case that was carried

by the vote of the retiring judge is to be torn open, rediscussed, and overthrown? God save the commonwealth, if such a precedent is to be established. The personnel of this court is very changeable. In less than twelve years that I have been here, I have sat with twelve gentlemen, including the four brethren now with me. We come and go by elections, if other causes do not remove us; but let it never be said that our records are as unstable as ourselves, or, worse still, as unstable as the vicissitudes of politics. Many estates in Pennsylvania are held and enjoyed to-day by virtue of votes that Judge Lowrie has cast in this court during the last twelve years. If this constitutional question, which was decided in the same way, is to be reopened because his successor is presumed to differ in opinion, I see not how any of the other questions are to be considered settled or the cases concluded. If these defendants are entitled to have Judge Lowrie reversed in this summary and unprecedented manner, I know not how we are to deny other suitors the same privilege. The general rule is, that courts do not allow themselves to be experimented upon. I would hold to that rule very firmly. I cannot admit that a popular election should overthrow a judicial record. I maintain that the decision of 9th November is the law of this court, and will be until it is regularly reversed or avoided, according to established judicial rules, and as such is entitled to be respected and obeyed by all orderly and loyal citizens.

I must be understood as conceding to the members of the court, from whom I differ, the same freedom of opinion and rectitude of purpose I claim for myself—and I do it most cheerfully—but I should be recreant to my convictions of duty, if I did not enter a very earnest protest against this proceeding to dissolve a regularly and a carefully granted injunction in the manner proposed. Judge Thompson and I would dismiss the motion to dissolve as unfit to have been entertained, but as we are overruled in this by a majority of the court as now constituted, something must be said of the other two questions discussed.

I do not intend to enter at large into the constitutional question again. Nor is it necessary, for the positions assumed in the opinions of the majority when the case was here before, much strengthened and confirmed by the last argument, were shaken by nothing that was advanced against them. It may not be unprofitable, however, to state the results to which the discussions at bar and on the bench have come.

It is agreed on all hands that the Government of the United States is a government of delegated powers; that the Constitution is the instrument of delegation; that the powers intended to be conferred are either expressed therein or are such as are

necessary for the carrying into effect the expressed powers; that the Federal government is supreme in the exercise of its rightful powers, and that all government powers not delegated to the Federal nor prohibited to the State government are reserved to the States and people.  It is further agreed that if the power to enforce a draft against the people of the State be conferred on Congress, it is contained in the thirteenth clause of the eighth section of the first article, " to raise and support armies."

The clause which authorizes Congress to pass all laws necessary to carry the enumerated powers into effect is sometimes mentioned as bearing on this question, but most thoughtlessly, for both the language of the clause and the judicial interpretation it has always received, import a grant of no new or additional power whatever, but only a recognition of the legislative duty to provide the necessary laws for carrying into effect the " foregoing powers."  What the foregoing powers are, will never be discovered from this clause, but only from the foregoing clauses.

All judges and lawyers are substantially agreed, therefore, that Congress does not possess the power to pass such an act as that of the 3d March, unless it be conferred by the thirteenth clause to raise and support armies.  But here opinions begin to diverge upon the rules of construction to be applied to that clause.

On one hand it is contended that the words, being simple, absolute, and unqualified, are to be received in their largest sense, and that they import a right to raise armies by any of the means that have ever been employed by civil governments, and conscription is claimed as one of the means practised by European governments, and sanctioned by Gen. Knox, when Secretary of War, and by Mr. Monroe in the war of 1812.  It is likened to the expressly conferred powers to levy and collect taxes, coin money, establish post roads, &c., all of which, it is argued, are unlimited powers, because plainly granted and not expressly qualified.  In further support of this view, Vattel, Grotius, Puffendorff, and other writers on natural law, are cited for the principle that the right to call on its citizens or subjects for military service is an essential and inherent right of every government.  When the attention of counsel was called to the fact that the act of Congress under review does not provide for drafting citizens generally, but only a certain class of citizens, to wit, the able-bodied men between 21 and 45 years of age, and that all citizens of that class constitute the State militia, for calling whom forth another part of the Constitution expressly provides, the answer was that the 16th and 17th clauses of the 8th section (which are the

[Kneedler v. Lane et al.  Smith v. Lane et al.  Nichols v. Lehman et al.]

militia clauses) conferred on Congress the chief control over the State militia, and hence it was inferred that Congress might draft them.

Such is an outline of the argument in support of the constitutionality of this statute.

Those of us who think the statute unconstitutional answer the argument by urging these several considerations :—

1st. That the Constitution, being a written document, must be taken as a whole, and every specific grant, however unqualified the language in which it is expressed, must be so construed as to be consistent with other provisions of the instrument—in a word, that the document must be construed in such a manner as to give effect to every part of it. No lawyer will deny that this is a settled canon of construction. If a will devises Black-acre to A in language that is unqualified, but in a subsequent clause gives half of Black-acre to B, no lawyer would insist on the positiveness of the first devise as a reason for excluding the second, but would receive the second as qualifying or limiting the first. Applying this familiar rule of construction to the case in hand, we say that if the 13th clause confers the power to draft any citizen for any war, it does not confer the power to draft the militia for suppression of an insurrection, because another and an inconsistent mode is subsequently provided in the Constitution for calling out the militia to suppress insurrections. I will not dwell on this argument, for it was fully presented in our former opinions; but I regret that so little of the subsequent discussion was directed to this point, which is the vital point of the controversy. Indeed, the very case is that of a law for enrolling and drafting the militia to suppress an insurrection. Now, if the Constitution does expressly declare that they shall be called forth under State officers to suppress insurrections, and does recognize the right of the States to maintain a militia, how can the same instrument authorize them to be drafted irrespective of State authority? If it declared in terms that they might be drafted, the Constitution would be guilty of the inconsistency, but it does not. It is only by misapplying the provision which authorizes armies to be raised by enlistment, that the inconsistency is made to disfigure the fair face of the Constitution.

As to the suggestion of counsel that the chief control of the militia is vested in Congress, this is a mistake. No organ of the General government has any control over the militia until they have entered the military service of the General government in pursuance of a call directed to the Governor or other proper military officer of the State. This is the purport of the language of the Constitution and of the judicial construction it has uniformly received. The militia are organized and dis-

[*Kneedler v. Lane et al. Smith v. Lane et al. Nichols v. Lehman et al.*]

ciplined by the States, according. to the rules prescribed by Congress, but this vests no more control in Congress than it would in an author whose work on military science the Constitution might have adopted instead of congressional rules of discipline. And. let nobody suppose this act to be the exercise of the power conferred by the 16th clause, to call out the militia, for it is not that either in fact or form. To call forth the militia, in a body, with their State officers at their head, is very unlike drafting them, man by man, into the Federal armies under such officers as the President may choose to appoint over them. The act does this latter thing, and therein it violates the Constitution.

The argument then remains unimpaired, almost untouched, which is derived from the militia clauses of the Constitution against the constitutionality of the act of Congress.

2d. But another limitation upon all the grants of power in the Constitution is to be implied from the nature or genius of the government which the Constitution formed. It was to be a free and popular government. Therefore the power to levy taxes, meant such taxes as would be necessary to the support of the government, levied in that equal and fair mode which free governments were accustomed to practise. This power, though absolute in its terms, was not a power to farm out the public revenues after the manner of tyrannical governments of Europe, nor the power to levy taxes for works of internal improvement, or for purposes of speculation.

So with the power to borrow money, nobody would contend that it would justify forced loans, which governments have sometimes practised, nor loans for any other purposes than support of the government.

So again with the power to maintain a navy, whilst all readers of the Constitution would imply the power to establish ship-yards, dry-docks, and naval asylums, no one would understand the press-gang to be legalized. And here let it be remarked as one of the curiosities of this subject, that impressment of militiamen into the Federal *armies* is claimed to be constitutional, whilst no American voice has yet been raised in favor of impressment into the Federal *navy*.

Take this very thirteenth clause: Congress shall have " power to *raise* and *support* armies." The power to support is as absolute as the power to raise, but does it mean that Congress may support armies by quartering them on the farmers of the country?

In all these instances, and in many more that might be cited, nay, in every instance of a granted power, the Constitution is to be taken as intending such an exercise of it as is consistent with popular liberty, which it was the purpose of the Constitu-

tion to secure.   Limitations in behalf of liberty are always to be implied.   And never can they be more in place than when, as here, citizens are complaining that the government is violating their liberty.

I think due attention has not been given to this argument—that all delegations of power are to be read in a manner consistent with the free and popular nature of the government.

. Generally, deeds are construed most strongly against grantors, and so are political constitutions when granted by rulers to people, but not when granted by a people to their rulers.   In this instance, the rule is to be taken inversely, and the grant is to be read most favorably to the grantors, because the natural tendency of political power is always from the many to the few, and the very end and aim of a written constitution, where the people write it, is to restrain this tendency.   To construe a people's constitution so as to ·favor usurpation—to throw doubts into the scale of rulers—to set up questionable powers against the unquestionable liberty of the citizen—is an unwholesome practice which, however grateful to the passions of the hour, may prove fatal to the republic.   It would not be difficult, indeed, to trace all the maladies the body politic has suffered to this practice.   A return to a strict construction of the Constitution—by which I mean ·a construction that denies no expressly granted power, and no implied power which is essential to the full enjoyment of the express powers, but a construction which limits itself to these two conditions, and always keeps in view the nature, scope, and purpose of the Constitution—would re-establish health and soundness.   When the colonies revolted they became "free and independent States, with full power to levy war, conclude peace, contract alliances, establish commerce, and do all other acts and things which independent States might do."   Amongst other things that such States might do was to confederate, and they did confederate.   Such States might form a General government as a common shield from external dangers and a common agent for the conduct of external and inter-state relations, and they did so.   Possessing as States all the sovereignty that pertains to any free government, they could impart to the General government all the powers essential to its purposes, without impairing their reserved powers to regulate all affairs purely domestic and local.   They set down in detailed language the powers conferred, and retained in mass whatever was not granted away or denied to themselves.

But if now we construe the grants irrespective of limitations which the scheme necessarily implies, and concede to Congress the power to pass all acts which they deem necessary to carry powers so read into effect, we had better have had no written

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

Constitution to dispute about. The government becomes whatever the government chooses to be—a limited monarchy or an unlimited despotism.

This power to raise and support armies meant the power which other governments, less free, exercised of raising armies by voluntary enlistments. The framers were not ignorant of the arbitrary and violent measures by which despotic governments sometimes raised armies, but they were not forming a despotic government. Great Britain, according to Hallam, had repudiated conscription as fit only for paupers and vagabonds. Voluntary enlistments were her main reliance when we formed our Constitution. This government, in all possible parts and forms, was to rest upon the consent of the governed. Did the framers mean, then, to pass by the example of the mother country, and plant in the Constitution of this more free government the imperial and despotic power of conscription? Did the people of the States mean to place themselves under a more severe rule than they were under before they revolted? Did they achieve freedom only to give it up in the very act of adding new securities? Is it credible that people of free and independent States voluntarily surrendered to any government on earth the power to force them from their homes and families into the tented field?

Until some evidence, historical or traditional, is produced in support of propositions which seem so monstrous to me, I must be pardoned for withholding assent to them.

3d. The denial that the power to draft citizens was ceded to the General government results in the conclusion that the power still remains with the States. No doubt the State may force its able-bodied men into the military service of the State. For here, *in the State,* is where that principle of natural law inheres, which has been erroneously ascribed to the General government. The State is *parens patriæ.* The Supreme Court of the United States said so in terms in *Wheeler* v. *Smith,* 9 Howard, 78. As such, the State possesses this great right of summoning all her children to her defence, and what she gave to the General government was the power of raising armies by enlistments and of calling forth the militia to execute the laws of the Union, suppress insurrections, and repel invasions. I repeat, this act of Congress is not and does not profess to be a militia law in pursuance of the sixteenth clause, and as it is not warranted by either the text, the history, or the reason of the thirteenth clause, it has no foundation in the Constitution to rest upon.

General Knox, in 1790, and Mr. Monroe, in 1814, expressed themselves in favor of a scheme of conscription, not indeed such as this law, but involving the same principle, and their good names have been much used in this argument. Against

them may be set off the constitutional arguments of Mason and Webster—the refusal of Congress to pass such a law in 1814, when we were at war with one of the mightiest nations of the globe—and the facts that Washington put down the Whiskey Insurrection—Madison carried the country through the war of 1812, and Polk carried it through the Mexican war, without a resort to conscription, or anything like it. Do not such names and facts more than answer the argument drawn from the suggestions of Knox and Monroe? Whilst great names ought not to weigh much in any argument, traditional testimony, or what it is commonly called among lawyers, contemporaneous construction, is entitled to great respect in fixing the meaning of any written document. That is to say, the generally received opinion amongst those most interested in a right interpretation of the document, is very high evidence of its meaning. This kind of testimony is altogether against such legislation as we are discussing. In all our history, since the formation of the Constitution, the general opinion of statesmen has been, as I believe, adverse to forced recruits for either the army or the navy.

4th. In one of the majority opinions, the 12th and 13th sections of the conscript law were alluded to as unconstitutional, on the ground that no citizen could be made liable to be shot as a deserter before he had entered the army, and Judge Story's Commentaries on the Constitution were cited to prove that militiamen are subjected to martial law only when in actual service, and not merely when called forth, before they have obeyed the call. To bring him within the meaning of being in actual service, there must be, says Judge Story, "some acts of organization, mustering, rendezvous, or marching done in obedience to the call."

It is remarkable that this argument, founded in the very language of our most accredited commentator, was not noticed in the last discussion. Was it because of the insignificance of the interests at stake—only the liberties of three citizens. Is it nothing to the people of Pennsylvania that they are liable to be shot, and their memories branded as deserters, if they fail to answer a notice of a draft? When such questions press home upon the hearts of the people, is it unworthy of counsel to look into the constitutional rights of the people? The deserter deserves to be punished, but he only can be a deserter who has become subject to martial law, and serving a paper notice on a man does not put him into actual service and subject him to martial law. It has been said that Judge Washington's *obiter dictum* in *Houston* v. *Moore,* 5 Whar. 1, explodes this rule as stated by Judge Story. What was decided in *Houston* v. *Moore* was the constitutionality of an act of

[Kneedler *v.* Lane et al.  Smith *v.* Lane et al.  Nichols *v.* Lehman et al.]

Assembly of the State of Pennsylvania for inflicting military punishment upon a militiaman neglecting to march with his detachment to the place of rendezvous, after being duly called out under the 16th clause of the 8th section of article 1 of the Constitution of the United States.

It was not the case of a draft under the 13th clause—it was not an act of Congress at all that the learned judge was to decide upon.   How an affirmance of the constitutionality of that State legislation can explode the rule of Federal law laid down by Judge Story, is hard to understand.   If it is meant that an unnecessary and inaccurate *obiter dictum* of Judge Washington, or anybody else, can explode a settled rule of constitutional law, that is staking the constitutionality of this part of the act of Congress on a desperate venture.   Some broader and more solid ground should be found to rest the argument upon.   Yet no other has been discovered or pointed out.

For these reasons, as well as for those rendered before, we still maintain that the enrolment act is unconstitutional, and this brings us to the final question, as to the remedy by injunction.

A few words as to the remedy.   In the opinions of Judge Lowrie and Judge Thompson, our act of Assembly was referred to as our authority for restraining acts contrary to law, and prejudical to the rights of individuals.   And it was shown that the acts complained of here were of that character, if the conscript law be unconstitutional.   If *habeas corpus* had not been suspended, that would have been the plaintiffs' true remedy; for in numerous cases, as was shown on the argument, State courts have delivered citizens from the military authority of the Federal government on *habeas corpus.*   But we are at present situated as if we had never had *habeas corpus.*   It is impossible, therefore, to deny the equity jurisdiction on the ground that there is remedy at law.   There is no remedy at law, and even where there is, the rule in equity is that it must be an adequate remedy to oust the jurisdiction of equity.   We had a great consideration a few years ago of the question whether equity would decree specific performance of a contract for sale of lands, there being remedies at law both by covenant and ejectment, but the equity jurisdiction was sustained on the ground of the inadequacy of the legal remedies.   Had there been no legal remedies whatever, which is the case here, the question would scarcely have been made.

I say no legal remedies, for *habeas corpus* being suspended, it cannot be seriously urged that a civil action for assault and battery would be a remedy for a citizen who denied the right of the government to put him into the army as a soldier.

But it is supposed that a State court cannot lawfully resist

[Kneedler v. Lane et al. Smith v. Lane et al. Nichols v. Lehman et al.]

the execution of an act of Congress. Here a distinction exists which never ought to be lost sight of. State courts have no power to interfere with or resist the *process or judgments of the Federal courts*, and the rule is reciprocal—the Federal courts have no power to disregard the process or judgments of State courts, as was determined in the notable case of *Taylor* v. *Carryl*, about the Royal Saxon, reported in 20th Howard, 583.

Of course, the appellate jurisdictions of the Supreme Court of the United States are to be excepted from this remark. In the forms of the Constitution that court may review certain proceedings of State courts; but in all other respects, even where concurrent jurisdiction exists over the subject-matter, the Federal and State courts mutually respect that jurisdiction which first attaches. The case of *Ableman* v. *Booth*, 21st Howard, 523, so much relied on, belongs to this class of questions upon judicial process, and all that fell from the chief justice in that case is to be restrained to the facts of the case. This is a rule always necessary to be imposed upon judicial language. That case is authority for nothing but the well-settled doctrine that State authorities cannot resist the *judicial process* of the United States.

But these defendants were not acting under any judicial process of the United States. They were mere ministerial agents of the executive department engaged in executing what we held to be an unconstitutional act of Congress, and, therefore, are not within the rule above stated, nor within the authorities cited to sustain that rule. Such ministerial agents have often been restrained by State courts and State judges, generally upon *habeas corpus*, where personal liberty has been at stake; but the right of State judges to inquire into the validity of ministerial proceedings under acts of Congress, is as perfectly vindicated by *habeas corpus* cases as any other. I refer to *Commonwealth* v. *Harrison*, 11 Mass. R. 63; *State* v. *Dimmick*, 12 N. H. 194; *Smith* v. *Shaw*, 12 Johns. 257; *State* v. *Brearly*, 2 Southard, 555; *Maryland* v. *Rutter*, 12 Niles' Reg. 115; *Commonwealth* v. *Murray*, 4 Binney, 487; *Commonwealth* v. *Barker*, 5 Binney, 428; *Commonwealth* v. *Fox*, 7 Barr, 336; *Olmstead's Case*, Brightly's R.; *Lackey's Case*, Ibid. 269.

I think these authorities fully sustain the proposition of the learned counsel, that a State court has the right to prevent the invasion of the personal liberty of the citizen of the State by officers of the United States, acting under color of an unconstitutional law, when the act complained of is not the subject of suit, prosecution, or proceeding in the courts of the United States.

And if a State court may do this in any form, we hold that this court may do it when sitting as a court of equity in a State where *habeas corpus* has been suspended. Our jurisdiction as

[Kneedler *v.* Lane et al.   Smith *v.* Lane et al.   Nichols *v.* Lehman et al.]

a court of equity under our act of 1836, has not been suspended, and any citizen has a right to appeal to it in defence of personal liberty. Courts of equity are accustomed to enjoin to prevent frauds, waste, nuisances, trespasses, obstructions, and diversion of watercourses, and in numerous other torts. The principle of injunctive relief against a tort is that the inadequacy of the remedy at law is a sufficient equity, and will warrant an injunction against the commission or continuance of the wrong: Adams' Equity, 478. The inadequacy of all remedies at law for infringement of personal liberty, when *habeas corpus* is suspended, is too plain to be doubted or discussed, and the necessary consequence is that courts of chancery would have jurisdiction, and the act of Assembly clothes us with all their powers. If courts of chancery have not jurisdiction of torts which touch liberty, what are we to say, that property is better guarded with us than liberty? Who is willing to stand on that ground? For one, I am not. I would not say that man has more rights in his horse or his house than he has in himself. If equity will restrain torts in respect to lands and goods, much more will it restrain torts in respect to the immensely higher interest—his liberty—when all legal remedies have been taken away.

Whilst more might be said on these questions, I do not deem it necessary, after the full discussion they received from the whole court on the former occasion. I would dismiss the motion to dissolve, both because it is premature, and because I entertain no doubt of the unconstitutionality of the act of Congress, and of our right or duty to enjoin against its execution. And I am happy to add that my Brother THOMPSON, concurs in all of these conclusions, though he would doubtless have expressed them better than I have done.

Since this opinion was prepared, I learn what was not stated before, that the injunctions awarded in these cases have not been issued. Had this fact been disclosed when the motion to dissolve was made, or even when it was argued, it would have modified the line of discussion, somewhat, that has been pursued.

But now that it has been disclosed, Judge THOMPSON and myself see in it only an additional reason for not granting the motion. Why dissolve an injunction which is not restraining the defendants? It is not because the decree hinders or delays them—it can only be, it seems to us, to expunge a record which a majority of the court now think a majority should not have made in November. That is not the legal and constitutional method of reviewing the decree. We, therefore, dissent from the opinion of the majority, even more earnestly than if the defendants were under restraint.

Justice THOMPSON, in a few words, expressed his concurrence in the views set forth by the chief justice.